897 A.2d 316

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT AND CROSS–
RESPONDENT, v. WALTER TOWNSEND, DEFENDANT–RE-
SPONDENT AND CROSS–APPELLANT.

Argued October 25, 2005—Decided May 15, 2006.

474

476

*Debra A. Owens,* Deputy Attorney General, argued the cause for appellant and cross-respondent (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

*Jay L. Wilensky,* Assistant Deputy Public Defender, argued the cause for respondent and cross-appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Lawrence S. Lustberg* and *Megan Lewis,* submitted a brief on behalf of amicus curiae, New Jersey Coalition for Battered Women (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys).

JUSTICE WALLACE, JR. delivered the opinion of the Court.

Twenty years after the death of his girlfriend, defendant was indicted for her murder. At trial, the State presented expert testimony related to battered women and battered woman's syndrome to convince the jury that the victim's dying declaration exonerating defendant was not credible. The jury found defendant guilty of murder. On appeal, the Appellate Division reversed, finding error in the admission of testimony about battered women and battered woman's syndrome and plain error in the trial court's failure to give a limiting instruction on the use of such testimony. The panel, however, found no due process violation based on the twenty-year pre-indictment delay. We granted the State's petition for certification and defendant's cross-petition. We now reverse the judgment of the Appellate Division and reinstate the jury verdict.

We conclude that the trial court properly admitted expert testimony concerning the common characteristics of battered women and battered woman's syndrome, and that the failure of the trial court to give a limiting instruction on the use of the expert's testimony was harmless error. We agree with the courts

below that the twenty-year delay between the date of the crime and the date defendant was indicted did not violate defendant's due process rights. We remand to correct the sentence.

## I.

The State presented evidence at trial to show that on December 11, 1981, defendant lived with his girlfriend, Norma Williams, and her two sons, seven-year-old Jason and three-year-old Brian. That evening, defendant entered the home and told the two boys to go upstairs. The boys did so but stopped on the staircase and watched as defendant repeatedly struck their mother with a two-by-four with exposed nails until she was motionless. Defendant then picked her up and called the boys to accompany him to the hospital.

While leaving the driveway, defendant crashed his blue pickup truck through the gate to the garage. On the way to the hospital, defendant instructed Jason to tell the police that a red tow truck struck his mother, after which three men jumped out of the truck and beat her with sticks. Defendant threatened to kill Jason if he did not tell that story.

At the hospital, Williams was examined in the emergency room by Dr. Abrid. Williams was drowsy but conscious, her blood pressure was low, and she had alcohol on her breath. She had a cut over her eye, multiple bone swelling, and internal injuries. Dr. Abrid found no damage to the brain stem, and Williams's eye movements were normal. Dr. Abrid ordered oxygen and a blood transfusion for Williams.

The police were called to investigate. Patrolman Joseph Salvatore and his partner arrived at the hospital around 6:45 p.m. and tried to speak to Williams. After telling Salvatore she was struck by a car, Williams lost consciousness. Salvatore then located defendant and the boys in the waiting room and questioned them. Defendant told Salvatore that when he arrived home and found Williams bleeding and leaning against the gate to their home, he immediately drove her to the hospital. Jason told Salvatore that a

red truck hit his mother and three men got out of the truck and beat her with sticks before leaving. Salvatore did not question Brian because of his youth.

Detective Theodore Pogorzelski arrived at the hospital around 9:30 p.m. After the doctor informed him that Williams was in critical condition and unable to talk, Detective Pogorzelski met with defendant and the boys. Jason repeated his story about the red truck, but when asked about the three men, he said he did not see them beat his mother.

At some point, Detective Pogorzelski was informed that he could try to speak to Williams. He told Williams the reason he was there and that her prognosis did not look good. Williams's only response was to moan. When the detective asked if defendant had hit her, Williams shook her head from side-to-side indicating "no." Then he asked her if a truck had hit her, and she replied by shaking her head "no." When the detective asked if a car struck her, she moved her head up and down indicating "yes." Williams did not respond when asked the color of the car. She died at 12:10 a.m., shortly after the questioning.

Meanwhile, Detectives Taylor and Pascillo were looking for evidence of a hit-and-run accident in front of Williams's home. They discovered that one of the chain-link gates to the driveway was damaged and had blue paint on it but found no debris, broken glass, or blood in the area. The police went door-to-door looking for witnesses but were unsuccessful. Later, when Officer Thomas Hoffman examined defendant's blue truck parked near the hospital, he observed recent damage to the left rear.

A few hours after Williams died, defendant and the boys were taken to the police station. Officer Hoffman claimed he overheard defendant tell Jason not to say anything to the police. At the station, defendant was separated from the boys. Initially, Jason was reluctant to talk to the police. When he decided to talk, he accused defendant of fighting with his mother and striking her with a board. Jason stated that defendant told him to tell the

story about the red truck and the three men. He also said that defendant's truck hit the driveway gate on the way to the hospital.

Prior to interviewing defendant, Detectives Pogorzelski and Taylor informed him of his *Miranda*[1] rights. After waiving his rights, defendant denied instructing Jason to tell the police that a red tow truck struck Williams and stated that he never threatened Jason. He claimed he was at the corner bar when Jason ran inside and exclaimed that a red car had smashed the gate to their driveway. Defendant said he immediately went home and discovered Williams on the driveway, moaning that a red car smashed through the gate.

That same day, Detective Pogorzelski re-interviewed Jason in the presence of his two uncles. Jason again accused defendant of killing his mother. Because Brian was only three years old, the police did not question him.

Defendant consented to a search of the house he shared with the decedent. The police found blood on the couch but no weapons. Defendant explained that he had placed Williams on the couch before taking her to the hospital. Pursuant to a search warrant, the police searched defendant's truck. They were unable to find any evidence to support the theory that defendant had struck Williams with his truck.

The police canvassed the neighborhood again but located no witnesses. One neighbor, thirteen-year-old Annissa Gaines, was prevented from speaking to the police by her mother. The police completed the investigation without filing any charges against defendant. The State recognized the weaknesses in its case: seven-year-old Jason was the only witness who had implicated defendant and Jason had relayed several different stories. Additionally, Williams had indicated to Detective Pogorzelski that defendant had not hit her, and that a car had struck her.

---

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

Thereafter, Jason and Brian lived with relatives and not defendant. When Brian turned eighteen, he moved to Trenton. Defendant was also living in Trenton, and Brian visited him several times. In May 2001, Brian read a newspaper article about unsolved homicides that mentioned his mother. Brian contacted Jason and discussed the article. Later, Jason called the Mercer County Prosecutor's Office and requested that the case be reopened.

On August 2, 2001, the prosecutor reopened the investigation. Detective Albert DiNatale interviewed and obtained statements from several people who had lived near Williams in 1981. One neighbor, Beulah Ball, whose home shared a common wall with Williams's house, recalled that on the evening of December 11, 1981, she heard a female voice say, "Please, don't hit me anymore, please. Take me to the hospital."

Another witness, Annissa Gaines, the thirteen-year-old whose mother prevented her from speaking to police in 1981, said she saw defendant tap the driveway gate with his truck, back up, and then ram the gate. She remembered seeing a child in the window of the house but did not see anyone near the gate or lying on the ground. The next day she learned of Williams's death.

Patricia Brevard, a childhood friend of Williams, stated that defendant did not seem upset when he told her about Williams's death. Later, when defendant visited her, he admitted he had injured Williams before taking her to the hospital. Brevard claimed that she was afraid that if she reported that information to the police, defendant would harm her.

On August 10, 2001, Brian gave a formal statement outlining his version of the incident. He stated that while his mother was on the couch, he observed defendant repeatedly strike her with a board containing exposed nails.

A third son of Williams's, Freddie Williams, also testified at trial. He was fifteen years old when his mother died. He had lived with his mother and defendant for about five years, but in

1978 or 1979 he moved in with his grandparents because he could not tolerate defendant's physical abuse of his mother.

Mercer County Medical Examiner Dr. Raafat Ahmad had performed an autopsy on Williams's body in December 1981. At that time, she listed the manner of death as "undetermined." When Dr. Ahmad reviewed the autopsy results again in May 2002, she concluded Williams's injuries were more consistent with having been beaten to death.

The State also presented the testimony of Dr. Judith Kabus, a licensed professional counselor. Dr. Kabus was a clinical supervisor who worked with abused women, incest victims, and rape victims at the Women's Center of Monmouth County from 1984 to 1998. She had counseled "hundreds" of battered women. The trial court found Dr. Kabus qualified to testify as an expert on battered women in general and battered woman's syndrome.

Dr. Kabus testified that to be diagnosed with battered woman's syndrome, a woman had to exhibit five of eight characteristics. She discussed the common behavioral characteristics that battered women and women with the syndrome exhibit. She claimed that although there is a slight difference between them, both groups often lie about abuse or the origin of their injuries to protect the batterer, as well as to protect themselves from more abuse.

Defendant presented the expert testimony of Dr. Ronald J. Coughlin, who was qualified as an expert in psychological trauma. Dr. Coughlin agreed that there are common behaviors between women with battered woman's syndrome and battered women who do not have the syndrome. Although he testified that in his experience lying to protect their batterers is a common behavioral characteristic of both groups of women, he was not aware of any research to support that finding.

Defendant did not testify. The jury found defendant guilty of murder. The trial court imposed an extended sentence of

"thirty years to life" imprisonment with five years of parole supervision.[2]

Defendant appealed his conviction and sentence. The Appellate Division reversed the conviction, finding that the admission of the victim's dying declaration did not justify permitting Dr. Kabus's testimony on battered women and battered woman's syndrome, and that it was plain error not to give a specific jury instruction to explain the limited purposes for which the State could use the battered woman's syndrome testimony. *State v. Townsend,* 374 *N.J.Super.* 25, 55–57, 863 *A.2d* 380 (2005). The panel rejected defendant's claims that it was error to admit evidence of his alleged prior instances of violence upon Williams and that the twenty-year delay in prosecuting the matter was a due process violation. *Id.* at 32–43, 863 *A.2d* 380.

The State petitioned for certification and defendant filed a cross-petition. We granted both petitions. 183 *N.J.* 218, 871 *A.2d* 95 (2005); 183 *N.J.* 219, 871 *A.2d* 95 (2005). We also granted *amicus curiae* status to the New Jersey Coalition for Battered Women.

## II.

■ Before turning to the State's arguments, we consider defendant's assertion that the lapse of almost twenty years between the date of the offense and the date of the indictment violated his right to due process.

Defendant argues that the twenty-year delay in his prosecution was unjustifiable and that he made a sufficient showing of prejudice to warrant dismissal of the indictment. He asserts that he met the standard for evaluating the issue of pre-indictment delay

---

[2] The State concedes that the sentence imposed was unlawful and that defendant must be resentenced. In 1981, when the crime was committed, the version of *N.J.S.A.* 2C:43–7 in effect provided that the extended-term sentence for a conviction of murder was a specific term of years between thirty years and life imprisonment.

set forth in *State v. Alexander*, 310 *N.J.Super.* 348, 355–56, 708 *A.2d* 770 (App.Div.), *certif. denied,* 156 *N.J.* 408, 719 *A.2d* 640 (1998). He notes that the State knew of Jason's account, had the same physical evidence in 1981 that it presented at trial in 2002, and had ample opportunity to develop evidence within a reasonable time frame. Defendant adds that an "account of extraordinary delays must be taken—in effect, a sliding scale established—by allowing for a less-specific showing of prejudice as the period of delay reaches and passes a point . . . that faded memories and lost documents would render a specific and detailed showing of prejudice improbable." He urges that he was prejudiced by the unavailability of witnesses, including two people present at the incident who were never questioned by the police, two detectives who witnessed Jason's contradictory statements, and one detective who was gravely ill in Puerto Rico at the time of trial.

The State counters that the trial court and the Appellate Division correctly rejected defendant's due process claim because defendant never proffered the actual content of the alleged lost testimony and failed to show how that testimony would have benefited him. The State adds that until it acquired additional evidence in 2001, it was not in a position to prove defendant's guilt beyond a reasonable doubt. Thus, the State concludes that it had legitimate reasons for the delay, and there was no evidence of bad faith or negligence on its part.

■ We have not previously addressed the standard our courts should apply when evaluating a request to dismiss an indictment based on unreasonable delay between the date of the crime and the date the charge is presented to a grand jury. In *State v. Szima*, 70 *N.J.* 196, 198–99, 358 *A.2d* 773, *cert. denied,* 429 *U.S.* 896, 97 *S.Ct.* 259, 50 *L.Ed.2d* 180 (1976), we were faced with a delay between arrest and the date of defendant's indictment. There, the defendant was arrested and charged in February 1972 and released on bail. *Id.* at 198, 358 *A.2d* 773. Twenty-two months later, the defendant was indicted. *Ibid.* His motion to dismiss the indictment on the ground that he had been denied his

Sixth Amendment right to a speedy trial was denied by the trial court. *Id.* at 198–99, 358 *A.2d* 773. The Appellate Division reversed, finding a violation of defendant's right to a speedy trial. *Id.* at 199, 358 *A.2d* 773. We disagreed and reinstated the indictment, noting, however, that the Sixth Amendment right to a speedy trial "attaches upon arrest on a criminal charge and need not await indictment or information." *Id.* at 199–200, 358 *A.2d* 773 (citation omitted). We agreed that the test enunciated in *Barker v. Wingo,* 407 *U.S.* 514, 519–20, 92 *S.Ct.* 2182, 2186–87, 33 *L.Ed.*2d 101, 110–11 (1972), was the proper test. *Szima, supra,* 70 *N.J.* at 201, 358 *A.2d* 773. That test requires the court to consider: (1) the length of the delay, (2) the reasons for the delay, (3) whether and how defendant asserted his speedy trial right, and (4) the prejudice to defendant caused by the delay. *Ibid.* We concluded that because the defendant made no attempt to dismiss the complaint, there was no prejudice to the defendant, and that even though the State failed to explain the twenty-two month delay, it did not violate the defendant's right to a speedy trial. *Id.* at 202, 358 *A.2d* 773.

■ The present matter does not involve the delay between arrest and indictment, but rather involves the delay between the commission of the crime and date of the indictment. Statutes of limitations protect defendants from oppressive pre-indictment delay. They are the guidepost to guard against overly stale criminal prosecutions and "provide predictable, legislatively enacted limits." *United States v. Lovasco,* 431 *U.S.* 783, 789, 97 *S.Ct.* 2044, 2048, 52 *L.Ed.*2d 752, 758 (1977).

■ Our Legislature has declared that there is no statute of limitations for prosecution of the crime of murder. *N.J.S.A.* 2C:1–6a. Despite that, the Due Process Clause of the United States Constitution provides an overlay to protect against oppressive pre-indictment delay. *Lovasco, supra,* 431 *U.S.* at 789, 97 *S.Ct.* at 2048, 52 *L.Ed.*2d at 758. That is, a due process violation occurs if the delay in prosecution violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions,

... and which define the community's sense of fair play and decency." *Id.* at 790, 97 *S.Ct.* at 2049, 52 *L.Ed.*2d at 752 (citations omitted).

"[T]he Fifth Amendment requires the dismissal of an indictment, even if it is brought within the statute of limitations, if the defendant can prove that the Government's delay in bringing the indictment was a deliberate device to gain an advantage and that it caused the defendant actual prejudice in presenting his defense." *United States v. Gouveia,* 467 *U.S.* 180, 192, 104 *S.Ct.* 2292, 2299, 81 *L. Ed.*2d 146, 157 (1984); *accord United States v. $8,850,* 461 *U.S.* 555, 563, 103 *S.Ct.* 2005, 2011, 76 *L.Ed.*2d 143, 151 (1983) (noting due process claims for delay in instituting criminal prosecutions "can prevail only upon a showing that the Government delayed seeking an indictment in a deliberate attempt to gain an unfair tactical advantage over the defendant, or in reckless disregard of its probable prejudicial impact upon the defendant's ability to defend against the charges").

Defendant acknowledges that *Gouveia, supra,* requires a showing that the indictment was deliberately delayed for tactical reasons before a due process violation will be found, but urges this Court to deviate from federal precedent and adopt a "sliding scale standard" that the longer the delay, the less the burden on defendant to show prejudice. 467 *U.S.* at 192, 104 *S.Ct.* at 2299, 81 *L.Ed.*2d at 157.

We have declared that "caution is required" in extending state constitutional protections beyond their federal counterparts. *Planned Parenthood of Cent. N.J. v. Farmer,* 165 *N.J.* 609, 620, 762 *A.*2d 620 (2000). When appropriate, we "endeavor to harmonize our interpretation of the State Constitution with federal law." *State v. Tucker,* 137 *N.J.* 259, 291, 645 *A.*2d 111 (1994) (citation omitted), *cert. denied,* 513 *U.S.* 1090, 115 *S.Ct.* 751, 130 *L.Ed.*2d 651 (1995). Nevertheless we will "apply our State Constitution under circumstances ... in which we are convinced that it should afford greater protection to our citizens than is afforded by the Federal Constitution, and support our conclusion that greater protection is appropriate on the basis of constitutional text, legislative history, state traditions, or other factors." *Ibid.*

Just as we apply the federal test in the analogous speedy trial context, we will apply the federal standard in determining whether a due process violation resulted from excessive pre-indictment delay. *See State v. Long,* 119 *N.J.* 439, 470–71, 575 *A.*2d 435

(1990), *superseded by statute on other grounds*, *N.J.S.A.* 2C:11–3i. That standard requires the defendant to show: (1) the State's delay in seeking the indictment was a deliberate attempt to gain an advantage over him, and (2) the delay caused defendant actual prejudice in his ability to defend the charge. *Gouveia, supra,* 467 *U.S.* at 192, 104 *S.Ct.* at 2299, 81 *L.Ed.*2d at 157.

■ Here, there was no evidence to suggest that the State intentionally delayed seeking an indictment to obtain a tactical advantage. The State recognized that in 1981 the most compelling evidence it had to establish defendant's guilt beyond a reasonable doubt was seven-year-old Jason's statement that defendant beat his mother with a board. However, the fact that Jason offered different versions of the incident weakened his credibility, and there were no other witnesses to support his account. Additionally, Williams had indicated a car struck her. We are satisfied that there was a reasonable basis for the State to conclude that the evidence available in 1981 was not sufficient to establish defendant's guilt beyond a reasonable doubt.

■ Further, defendant failed to meet the actual prejudice prong of the test and establish that "the delay caused actual and substantial prejudice endangering his right to a fair trial." *Alexander, supra,* 310 *N.J.Super.* at 355, 708 *A.*2d 770 (citations omitted). Defendant merely asserted prejudice due to the unavailability of several witnesses. However, defendant failed to offer the content of their testimony, to explain how that testimony would help his defense, and to recount his efforts to locate those individuals. Consequently, defendant's proofs failed to show actual prejudice.

In sum, defendant did not meet either prong of the test required to prove a due process violation for pre-indictment delay. We affirm the judgment of the Appellate Division denying defendant's motion to dismiss the indictment.

### III.

We turn now to the issue whether Dr. Kabus was qualified to testify about battered women and battered woman's syndrome and whether her opinion was an inadmissible net opinion. Defendant contends that the issue is whether characteristics of battered women not diagnosed with the syndrome will be accepted as competent and relevant, not whether the expert may rely on experience. Further, he argues that the battered woman's syndrome expert testimony was not relevant because the State did not contend that Williams suffered from the syndrome. He asserts that allowing that testimony invited the jury to make a diagnosis that the State's expert could not make.

### A.

██ In this case the victim was never evaluated for battered woman's syndrome. We must determine whether it is appropriate to admit expert testimony that a battered woman may exhibit traits, such as lying to protect her abuser, that are associated with the syndrome. Because the trial court admitted the victim's testimony under the dying declaration exception to the hearsay rule, the State sought to eliminate the impact of that evidence through testimony explaining why a victim would try to exonerate her abuser. The credibility of the victim was critical. If the jury believed she was telling the truth when she gave an apparent negative answer by nodding her head to indicate that defendant did not injure her, then that would be strong evidence that defendant was not guilty. Thus, the expert testimony, if believed, was relevant to explain the victim's failure to accuse defendant.

Pursuant to the *New Jersey Rules of Evidence,* "scientific, technical or other specialized knowledge" by a witness "qualified as an expert by knowledge, skill, experience, training, or education" may be admissible "in the form of an opinion or otherwise" if the expert testimony will assist the jury "to understand the evidence or to determine a fact in issue." *N.J.R.E.* 702.

"[T]he rule sets forth three basic requirements for the admission of expert testimony: '(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.'" *State v. Torres*, 183 *N.J.* 554, 567–68, 874 *A.2d* 1084 (2005) (quoting *State v. Berry*, 140 *N.J.* 280, 290, 658 *A.2d* 702 (1995) (citation omitted)).

More than twenty years ago, we recognized that sociologists and psychologists had studied the effects a "sustained pattern of physical and psychological abuse can have on a woman." *State v. Kelly*, 97 *N.J.* 178, 192–93, 478 *A.2d* 364 (1984). Writing for the Court, Chief Justice Wilentz noted that "a battering relationship embodies psychological and societal features that are not well understood by lay observers" and that "these features are subject to a large group of myths and stereotypes." *Id.* at 209, 478 *A.2d* 364. We held that "the battered-woman's syndrome is an appropriate subject for expert testimony; that the experts' conclusions, despite the relative newness of the field, are sufficiently reliable under New Jersey's standards for scientific testimony; and that defendant's expert was sufficiently qualified." *Id.* at 187, 478 *A.2d* 364.

We have no doubt that the ramifications of a battering relationship are beyond the ken of the average juror. *See id.* at 205–07, 478 *A.2d* 364. Thus, the first requirement for the use of expert testimony was satisfied here.

The next requirement is that the expert's testimony must be sufficiently reliable. *Id.* at 223–24, 478 *A.2d* 364. There are three ways "a proponent of expert testimony can prove its reliability in terms of its general acceptance within the professional community." *Id.* at 224, 478 *A.2d* 364. The first is "by the testimony of knowledgeable experts"; the second is by the use of "authoritative scientific literature"; and the third is by "persuasive judicial decisions that acknowledge such general acceptance of expert testimony." *Ibid.*

It is beyond debate that "battered women's syndrome has gained general acceptance as a scientific doctrine within the

professional community." *Id.* at 225, 478 *A.2d* 364. Recently, we noted that "the syndrome has become widely accepted as admissible evidence in self-defense cases because it has been determined to be useful in explaining conduct exhibited by battered women toward their abusers." *State v. B.H.*, 183 *N.J.* 171, 183, 870 *A.2d* 273 (2005). We further explained that although battered woman's syndrome is not included as a psychological syndrome in the Diagnostic and Statistical Manual of Mental Disorders, battering is considered "a potential triggering event for Post Traumatic Stress Disorder." *Ibid.*; *see* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 463–68 (4th ed. 2000); *see also* Lenore E.A. Walker, *Battered Women Syndrome and Self-Defense*, 6 *Notre Dame J.L. Ethics & Pub. Pol'y* 321, 327 (1992).

The question before us is whether expert testimony concerning the traits of a battered woman who has not been diagnosed as suffering from battered woman's syndrome is reliable. Some commentators have advocated the use of testimony about battering and its effects on the victim without requiring a diagnosis of battered woman's syndrome. *See, e.g.,* Sue Osthoff & Holly Maguigan, *Explaining Without Pathologizing*, in *Current Controversies on Family Violence* 225–40 (Donileen R. Loseke, Richard J. Gelles & Mary M. Cavanaugh eds., 2005); Mary Ann Dutton, *Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome*, 21 *Hofstra L.Rev.* 1191 (1993); Myrna S. Raeder, *The Better Way: The Role of Batterers' Profiles and Expert "Social Framework" Background in Cases Implicating Domestic Violence*, 68 *U. Colo. L.Rev.* 147, 178–87 (1997); Joan M. Schroeder, Note, *Using Battered Woman Syndrome Evidence in the Prosecution of a Batterer*, 76 *Iowa L.Rev.* 553, 568 (1991). The State's expert, Dr. Judith Kabus, testified at the *Rule* 104 hearing that she was a licensed professional counselor with a Ph.D. in psychology and was knowledgeable about marriage counseling and family therapy. She was the clinical supervisor of the Women's Center of Monmouth County

from 1984 to 1998, where she counseled hundreds of battered women individually and in groups. Dr. Kabus stated that she was aware of current scientific and psychiatric literature about battered women and battered woman's syndrome, and had made presentations on battered women to hospitals, police departments, social service agencies, and educational institutions. Dr. Kabus further testified that her training and experience familiarized her with the characteristics of battered women, including women with battered woman's syndrome. Defendant's expert, Dr. Coughlin, testified that based on his experience there are behaviors commonly exhibited by battered women regardless of whether they have been diagnosed as having the syndrome. He agreed that among those behaviors was lying about the source of injuries to protect the batterer or to protect oneself from further abuse, although he had not seen any research to support that conclusion. We conclude that the record before us amply demonstrates that the characteristics of battered women with or without a diagnosis of battered woman's syndrome are sufficiently reliable to support expert testimony as an aid to the jury.

The final requirement for admissibility is whether the expert is "qualified by knowledge, skill, experience, training, or education." *Torres, supra,* 183 *N.J.* at 572, 874 *A.*2d 1084 (citation omitted). Here, the evidence was overwhelming that Dr. Kabus was qualified to offer the proffered testimony. Indeed, Dr. Kabus was previously qualified to testify as an expert about battered woman's syndrome in *State v. Frost,* 242 *N.J.Super.* 601, 616–17, 577 *A.*2d 1282 (App.Div.), *certif. denied,* 127 *N.J.* 321, 604 *A.*2d 596 (1990).

The trial court has discretion in determining the sufficiency of the expert's qualifications "and [its decision] will be reviewed only for manifest error and injustice." *Torres, supra,* 183 *N.J.* at 572, 874 *A.*2d 1084 (citations omitted). We find no manifest error to disturb the trial court's determination that based on her training and experience, Dr. Kabus was qualified to give expert testimony on battered women and battered woman's syndrome.

B.

The Appellate Division concluded that although testimony in respect of battered woman's syndrome satisfied the requirements of *New Jersey Rule of Evidence* 703, the testimony that battered women not diagnosed with battered woman's syndrome exhibit characteristics similar to women with the syndrome did not. *Townsend, supra,* 374 *N.J.Super.* at 55, 863 *A.*2d 380. The Appellate Division also found that it was plain error to admit those discrete expert opinions that were net opinions. *Id.* at 56, 863 *A.*2d 380.

*Rule* 702 permits a qualified expert witness to testify "in the form of an opinion or otherwise," and *Rule* 703 addresses the "bases of opinion testimony by experts." *Rule* 703 is intended to permit expert opinion based on "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts in forming opinions on the same subject." Richard Biunno, *New Jersey Rules of Evidence* 896 (2005). The corollary of that rule is the net opinion rule, which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data. *Creanga v. Jardal,* 185 *N.J.* 345, 360–62, 886 *A.*2d 633 (2005); *State v. Papasavvas,* 163 *N.J.* 565, 607, 751 *A.*2d 40 (2000). Simply put, the net opinion rule "requires an expert to give the why and wherefore of his or her opinion, rather than a mere conclusion." *Rosenberg v. Tavorath,* 352 *N.J.Super.* 385, 401, 800 *A.*2d 216 (App.Div.2002) (quotation omitted).

Here, Dr. Kabus qualified as an expert after describing her education and her considerable experience counseling battered women. She also testified that as part of her work she stayed current with the scientific and psychiatric literature about battered women and battered woman's syndrome, and that through her training and experience she was familiar with the characteris-

tics of battered women and women with battered woman's syndrome.

Dr. Kabus gave the jurors general information about battering and its effects, including battered woman's syndrome. She explained how she diagnosed battered woman's syndrome and that a battered woman must manifest five or six of the eight diagnostic criteria. She made clear that although some battered women meet the criteria for a diagnosis of battered woman's syndrome, others do not. She opined that a behavior common to battered women, whether or not they suffer from battered woman's syndrome, is that they lie about the source of their injuries. She stated that a battered woman will lie for any number of reasons, including fear of retaliation by the batterer, embarrassment, fear that she will not be believed, or protection of her batterer, whom she may love or on whom she may be economically dependent.

We find that Dr. Kabus's education, training, and most importantly, her experience, provided a sound foundation for her opinion and that her opinion was not a net opinion. *See Torres, supra,* 183 *N.J.* at 578–79, 874 *A.*2d 1084 (noting police officer's combined experiences of gang-member interviews, numerous hours of seminar instruction, and multiple conversations with fellow officers qualified him to give expert testimony on gang hierarchy, organization, and discipline); *see also Rosenberg, supra,* 352 *N.J.Super.* at 403, 800 *A.*2d 216 (explaining that "evidential support for an expert opinion is not limited to treatises or any type of documentary support, but may include what the witness has learned from personal experience"); *Bellardini v. Krikorian,* 222 *N.J.Super.* 457, 462–63, 537 *A.*2d 700 (App.Div.1988) (commenting "that an expert may rely on his own knowledge, as well as on facts supplied to him by others"). Consequently, the trial court properly admitted Dr. Kabus's testimony about domestic violence and the effects of battering even though the victim had not been diagnosed as suffering from battered woman's syndrome.

Our conclusion is consistent with the decisions of other jurisdictions that have examined this issue. For example, in *People v.*

*Brown,* the California Supreme Court noted that in 1991 the California legislature passed a statute providing for the admittance of "expert testimony ... regarding battered woman's syndrome, including the nature and effect of physical, emotional, or mental abuse ... or behavior of victims of domestic violence." 33 *Cal.*4th 892, 16 *Cal.Rptr.*3d 447, 94 *P.*3d 574, 578 (2004). The court addressed whether in the absence of a diagnosis of battered woman's syndrome, expert testimony on the behavior of battered women was admissible. *Id.* at 581–84. The court compared the use of expert testimony to explain the behavior of victims of domestic violence to the use of expert testimony to explain the behavior of victims of rape or child abuse. *Id.* at 582–83. In the latter cases, the admissibility of expert testimony on the behaviors of victims generally is not contingent on a showing that the victim involved was diagnosed with a syndrome. *Id.* at 584. The court concluded that expert testimony without a diagnosis of battered woman's syndrome was admissible. *Ibid.*

A similar result was reached in *State v. Borrelli,* 227 *Conn.* 153, 629 *A.*2d 1105 (1993). There, the trial court permitted the State to offer expert testimony to explain that the victim's recantation of her report of abuse was a behavior consistent with battered woman's syndrome. *Id.* at 1106. In finding that the expert's testimony was properly admitted on the issue of the credibility of the victim, the Connecticut Supreme Court noted that the expert's testimony "was based on his observations of a large group of battered women through the lens of his educational background and experience," and that the expert did not testify that the victim was a battered woman "or whether she exhibited the typical behavioral characteristics of a battered woman." *Id.* at 1111; *see also Arcoren v. United States,* 929 *F.*2d 1235, 1239–41 (8th Cir.), *cert. denied,* 502 *U.S.* 913, 112 *S.Ct.* 312, 116 *L.Ed.*2d 255 (1991) (noting expert may testify generally about battered woman's syndrome as possible explanation for victim's conduct to aid jury in evaluating evidence but may not testify that victim suffered from battered woman's syndrome); *State v. Cababag,* 9 *Haw.App.* 496, 850 *P.*2d 716, 721–23, *cert. denied,* 74 *Haw.* 652, 853 *P.*2d 542

(1993) (finding that based on training and experience, expert properly testified about characteristics exhibited by victims of domestic violence); *Isaacs v. State,* 659 *N.E.*2d 1036, 1040–41 (Ind.1995), *cert. denied,* 519 *U.S.* 879, 117 *S.Ct.* 205, 136 *L.Ed.*2d 140 (1996) (ruling that expert testimony about battered woman's syndrome was admissible in murder prosecution as possible explanation of victim's behavior even though expert had not heard testimony or ever spoken to defendant, victim, or any other witnesses); *State v. Rodriguez,* 636 *N.W.*2d 234, 245–46 (Iowa 2001) (ruling that expert who met victim but had no information about case may testify about domestic violence, including battered woman's syndrome); *Commonwealth v. Goetzendanner,* 42 *Mass. App.Ct.* 637, 679 *N.E.*2d 240, 243–46, *review denied,* 425 *Mass.* 1105, 682 *N.E.*2d 1362 (1997) (ruling that expert testimony about domestic violence and battered woman's syndrome in general terms was properly admitted to explain victim's conduct, so long as expert did not offer an opinion or diagnosis that victim suffers from syndrome); *People v. Christel,* 449 *Mich.* 578, 537 *N.W.*2d 194, 201, *reh'g denied,* 450 *Mich.* 1212, 539 *N.W.*2d 504 (1995) (ruling that expert may explain generalities of battered woman's syndrome to describe uniqueness of particular behavior at issue, but expert may not offer opinion whether victim was battered woman); *State v. Grecinger,* 569 *N.W.*2d 189, 194–97 (Minn.1997) (ruling that expert testimony on battered woman's syndrome is admissible to explain victim's behavior if expert merely describes syndrome and its characteristics and does not opine whether victim suffers from syndrome); *State v. Stringer,* 271 *Mont.* 367, 897 *P.*2d 1063, 1067–70 (1995) (noting that if State lays appropriate foundation to establish victim was battered, expert may testify about battered woman's syndrome and behavioral characteristics of battered women but may not offer opinion that victim was battered woman); *State v. Searles,* 141 *N.H.* 224, 680 *A.*2d 612, 616 (1996) (ruling that expert testimony about battered woman's syndrome, where expert had never spoken with victim, daughter, or defendant, was admissible to explain effects of family violence and why victims minimize conduct or recant); *People v. Ellis,* 170

*Misc.*2d 945, 650 *N.Y.S.*2d 503, 507–09 (N.Y.Sup.Ct.1996) (ruling that expert testimony about battered woman's syndrome and characteristic behaviors of battered women are relevant and admissible to aid jury in understanding behavior of victim in light of evidence that victim was battered woman); *State v. Ciskie,* 110 *Wash.*2d 263, 751 *P.*2d 1165, 1174 (1988) (finding expert testimony on battered woman's syndrome and post-traumatic stress disorder admissible to explain victim's behavior, but stating preference to bar expert's opinion that victim suffered from post-traumatic stress disorder even though jury was free to infer that "stressor" was complained-of acts); *State v. Mayer,* 220 *Wis.*2d 419, 583 *N.W.*2d 430, 433–34 (Ct.App.), *review denied,* 220 *Wis.*2d 367, 585 *N.W.*2d 159 (1998) (ruling expert testimony about characteristics of victims of domestic abuse and about battered woman's syndrome is relevant and admissible despite absence of evidence that victim suffered from battered woman's syndrome).

## IV.

Finally, we address whether a new trial is required because the trial court failed to give a limiting instruction on the proper use of expert testimony in respect of the characteristics shared by battered women and women suffering from battered woman's syndrome. Defendant raised this issue for the first time on appeal and did not object at trial. Consequently, we consider it under the plain error rule. *R.* 2:10–2.

Our court rules provide that a party waives the right to challenge on appeal any portion of the jury charge if he or she fails to object to it. *R.* 1:7–2. We may reverse on the basis of unchallenged error if we find error that was "clearly capable of producing an unjust result," *R.* 2:10–2, commonly known as the "plain error" standard. "Plain error in the context of a jury charge is 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an

unjust result.'" *Torres, supra,* 183 *N.J.* at 564, 874 *A.*2d 1084 (quoting *State v. Jordan,* 147 *N.J.* 409, 422, 688 *A.*2d 97 (1997) (citations omitted)). In applying that standard, we must read the charge as a whole. *Ibid.* Moreover, "[a]lthough arguments of counsel can by no means serve as a substitute for instruction by the court, the prejudicial effect of an omitted instruction must be evaluated in light of the totality of the circumstances including all the instructions to the jury, [and] the arguments of counsel." *State v. Marshall,* 123 *N.J.* 1, 145, 586 *A.*2d 85 (1991) (citations omitted), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993).

 Here, the expert testimony informed the jury about the effects of battering on women and described the commonly observed behaviors of both battered women who are not diagnosed with the syndrome and those identified as suffering from the syndrome. The State offered Dr. Kabus's testimony to explain that victims of domestic violence often lie about their injuries. That information was put forward to help the jury evaluate the victim's credibility when she seemed to indicate that defendant did not injure her. In those circumstances, we are convinced that the jury should have been instructed that the expert testimony was admitted for the limited purpose of assessing the victim's credibility. *See B.H., supra,* 183 *N.J.* at 201, 870 *A.*2d 273.

 Despite that shortcoming, we conclude that the expert testimony did not have the capacity to reach an unjust result. As noted, neither expert opined that the victim suffered from battered woman's syndrome or that she was a battered woman. The evidence was useful for the jury's evaluation of the victim's credibility. Moreover, the prosecutor, in her summation, urged the jurors to rely on Dr. Kabus's testimony to find that if the victim understood the detective's question, her response was a lie to protect defendant or to protect herself from defendant.

At trial, the jury received copious and harrowing eyewitness testimony from the victim's children describing numerous instances of domestic violence by defendant against the victim, along with

evidence of the beating that led to the victim's death. Moreover, in regard to the prior acts of domestic violence, the trial court gave an appropriate limiting instruction on the use of that evidence, explaining that the jury could not use that evidence to decide that the defendant has a tendency to commit crimes or that he is a bad person in general. Considering the charge as a whole and the arguments of counsel, we are satisfied that the absence of an instruction to limit the use of the expert's testimony to evaluation of the victim's credibility was harmless error.

## V.

Because we do not have a model jury charge for the use of expert testimony concerning the characteristics of battered women and battered woman's syndrome, we refer the matter to the Committee on Model Criminal Jury Charges for its consideration and development of a proposed model charge.

## VI.

We affirm in part and reverse in part the judgment of the Appellate Division and remand to the trial court to reinstate the judgment of conviction and to resentence defendant.

JUSTICE RIVERA–SOTO, concurring in part and dissenting in part.

I concur with the majority's holding that "the twenty-year delay between the date of the crime and the date defendant was indicted did not violate defendant's due process rights." *Ante*, 186 *N.J.* at 480, 897 *A.*2d at 320 (2006). However, because the majority holds that "the trial court properly admitted expert testimony concerning the common characteristics of battered women and battered woman's syndrome, and that the failure of the trial court to give a limiting instruction on the use of the expert's testimony was harmless error[,]" *ibid.*, a conclusion with which I strongly disagree, I respectfully dissent.

## I.

At defendant's trial for the murder of his girlfriend, Norma Williams, the prosecution elicited Williams's dying declarations.[1] Those dying declarations exculpated defendant; as the majority notes:

> At some point, Detective Pogorzelski was informed that he could try to speak to Williams. He told Williams the reason he was there and that her prognosis did not look good. Williams's only response was to moan. When the detective asked if defendant had hit her, Williams shook her head from side-to-side indicating "no." Then he asked her if a truck had hit her, and she replied by shaking her head "no." When the detective asked if a car struck her, she moved her head up and down indicating "yes." Williams did not respond when asked the color of the car. She died at 12:10 a.m., shortly after the questioning.
>
> [*Id.* at 481, 897 *A.*2d at 321]

The prosecution sought to blunt the exculpatory effect of these dying declarations. Instead of collaterally impeaching its own witness,[2] the State sought to mutate Williams's denials into affirmative responses by applying interpretive principles recognized as valid when dealing with battered woman's syndrome testimony. That mutation, which the majority condones both in its application as well as in the trial court's failure to provide a limiting instruction as to its use, is a gross misapplication of the battered woman's syndrome. Those considerations—the admissibility of battered

---

[1] *N.J.R.E.* 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *N.J.R.E.* 802 specifically provides that "[h]earsay is not admissible except as provided by these rules or by other law." *N.J.R.E.* 804(b)(2) exempts dying declarations, also referred to as statements made under the belief of imminent death, from the hearsay rule's proscription against statements offered to prove the truth of the matter asserted: "In a criminal proceeding, a statement made by a victim unavailable as a witness is admissible if it was made voluntarily and in good faith and while the declarant believed in the imminence of declarant's impending death." This was a criminal proceeding against defendant, the declarant was the alleged murder victim, and the prerequisite of the declarant's belief in the imminence of her death was amply demonstrated at trial.

[2] *N.J.R.E.* 607 specifically provides that "any party including the party calling the witness may examine the witness and introduce extrinsic evidence relevant to the issue of credibility...."

woman's syndrome testimony in the first instance and, assuming its admissibility, the trial court's failure to issue a limiting jury instruction—are addressed separately.

## II.

## A.

The majority rightly explains that the genesis of the battered woman's syndrome in our jurisprudence lies in *State v. Kelly,* 97 *N.J.* 178, 478 *A.*2d 364 (1984). More recently, in *State v. B.H.,* 183 *N.J.* 171, 870 *A.*2d 273 (2005), we explained that, consistent with *Kelly's* limitations, battered woman's syndrome expert testimony is circumscribed to those instances that support a claim of self-defense. *Id.* at 184–85. *B.H.* places the utility of battered woman's syndrome expert testimony in its proper context: "the testimony would clarify and refute myths associated with battered women, and, in the context of that case, would assist the jury in its determination of the honesty of a defendant's belief that deadly force was necessary to protect herself against her abuser." *Id.* at 185, 870 *A.*2d 273 (citations omitted). We recognized that, "[i]n the wake of *Kelly,* battered woman syndrome evidence has been admitted to support a claim of self-defense and to assist juries in related credibility determinations by explaining why an abused woman would continue to live with an abuser." *Ibid.* (citations omitted).

What the majority ignores is the import of what *B.H.* and its companion case, *State v. Brennan,* 183 *N.J.* 202, 870 *A.*2d 292 (2005), clearly hold: battered woman's syndrome testimony has no application other than to assist the jury in understanding mental state. For that reason, in *B.H.,* we "discern[ed] no place for battered woman syndrome evidence in [the] assessment" of whether a defendant claiming battered woman status can interpose the affirmative defense of duress available under *N.J.S.A.* 2C:2–9(a). *State v. B.H., supra,* 183 *N.J.* at 199, 870 *A.*2d 273.

Here, Williams's mental state was relevant for one purpose and only one purpose: to determine whether she was under the belief of the imminence of her death when she made her dying declarations. *See N.J.R.E.* 804(b)(2). Those proofs were provided without contradiction by the prosecution's own witness, Detective Pogorzelski. Once the predicate for the admissibility of Williams's dying declarations was established, her statements exculpating defendant were admissible.

The vice here lies in what followed. Recognizing the exculpatory nature of Williams's dying declarations, the State sought to interpret Williams's dying declarations as those of a battered woman's who, for the reasons explained in *Kelly* and its progeny, would lie to protect her abuser. Regrettably, as the majority is forced to acknowledge, there was no proof presented to the jury upon which to predicate any expert proofs concerning battered woman syndrome, a point underscored by the refusal of both the State's and defendant's expert to "opine[ ] that the victim suffered from battered woman's syndrome or that she was a battered woman." *Ante,* 186 *N.J.* at 499, 897 *A.*2d at 332 (2006). Given the glaring absence of any proof that Williams's dying declarations were even eligible for consideration as testimony provided as a result of battered woman's syndrome or that Williams herself was a battered woman, the admission of any expert testimony that sought to interpret Williams's dying declarations was error clearly capable of producing an unjust result.

We are not confronted with a circumstance where Williams's dying declarations required expert testimony to interpret them: Williams did not speak in a language foreign to the jurors and her clear exculpations of defendant did not trigger a need to "assist the trier of fact to understand the evidence or to determine a fact in issue." *N.J.R.E.* 702. To be sure, the State needed to defuse Williams's exculpations of defendant's liability for her death. The State's needs, however, are not the jury's needs. The issue here is whether the jury—and not the State—needed expert testimony concerning battered woman's syndrome in order to understand

Williams's unequivocal dying declaration. Based on this record, with its stark absence of any conclusive proof that Williams was a battered woman or that she suffered from battered woman's syndrome, the jury did not need expert testimony to understand what we expect of toddlers: that " 'no' means 'no'."

Nor are we confronted with the use of battered woman's syndrome evidence as an explanation for a later inconsistency arising from a prior statement, a recantation, or the minimization of harm inflicted. In that respect, the consistency asserted by the majority in "the decisions of other jurisdictions that have examined this issue[,]" *ante*, 186 *N.J.* at 495, 897 *A.*2d at 329 (2006), does not withstand close scrutiny. All but one of those decisions address the now almost generally permitted but limited use of battered woman's syndrome evidence in the context of assorted assault claims: to explain why battered women either recant or minimize their description of the violence done to them, or why they remain in a relationship with their batterer. *Ante*, 186 *N.J.* at 495–98, 897 *A.*2d at 329–31 (2006). Indeed, the better, and more relevant, view lies in the only case cited by the majority where the victim died and hence was unavailable to testify at trial. *Isaacs v. State*, 659 *N.E.*2d 1036 (Ind.), *cert. denied*, 519 *U.S.* 879, 117 *S.Ct.* 205, 136 *L.Ed.*2d 140 (1996). In *Isaacs*, the defendant was charged with murder and alleged self-defense during a fight with the victim. *Id.* at 1037–38. The defendant sought to offer the statements he claimed his victim made to him during the course of the altercation that resulted in the victim's death. *Id.* at 1038. The trial court refused to allow the defendant to testify as to those statements, agreeing with the prosecution that they were "inherently unreliable, self-serving hearsay[,]" *ibid.*, a conclusion sustained by the Supreme Court of Indiana as harmless error. *Id.* at 1039.[3] However, once the defendant testified and laid out his self-defense claim, the prosecution in rebuttal was permitted to

---

[3] Here, in contrast, both the majority and I agree that the trial court properly ruled Williams's statements admissible as dying declarations. *See supra,* 186 *N.J.* at 490, 897 *A.*2d at 326 (2006).

offer expert proofs concerning battered woman's syndrome for the following reasons:

During his direct examination, [the defendant] characterized his relationship with [the victim] as "daytime friends and nighttime lovers." R. at 2071. The State's purpose for introducing [the battered woman's syndrome expert] testimony was to refute the notion that [the defendant] and [the victim] had a friendly relationship prior to her death. This testimony could have reasonably discredited [the defendant's] attempt to bolster his accident/self-defense theory by allowing the jury to conclude that their relationship was not rosy, thereby casting doubt on [the defendant's] assertion that he would not have intended to kill [the victim].

We therefore conclude that the trial court was within the range of its discretion to decide that this testimony was relevant and that its prejudicial effect did not outweigh its probative value.

[*Id.* at 1041.]

The overarching lesson of the cases tendered by the majority is thus different from the support the majority seeks from them. That lesson is that battered woman's syndrome expert testimony is permitted to explain those behaviors that are unique to that syndrome: outright recantations or any lesser inconsistencies with prior statements; minimization of the violence done to the victim; explanations why the victim remained in a relationship with her batterer; or, as in *Isaacs*, to rebut a claim of self-defense. None of those considerations are relevant here.

The illogic of the majority's view is underscored further by its inapplicability in other settings. If one assumes that Williams did not ultimately die but instead survived and testified at trial consistent with the exculpatory tone of her dying declarations, there can be no doubt that this Court would soundly condemn any attempt by the State to collaterally attack Williams's trial testimony with the same battered woman's syndrome expert testimony the majority permits here. Alive, Williams would have been subject to impeachment under *N.J.R.E.* 607 by extrinsic evidence relevant to her credibility. As our jurisprudence makes patent, battered woman's syndrome evidence does not address a witness' credibility but, instead, her reasons for protecting her abuser. Thus, it simply is not relevant for impeachment purposes. *State v. Burris,* 145 *N.J.* 509, 534–35, 679 *A.2d* 121 (1996) (citations omitted) ("Evidence introduced under the impeachment exception

often poses a significant danger because the information directly relates to the offense but the jury can consider it only for the purpose of evaluating the [witness'] credibility. Trial courts should be especially cautious when considering whether to permit such evidence."). Its admission by the trial court was reversible error.

## B.

Even if one were to assume that battered woman's syndrome expert testimony was relevant and, hence, admissible, the trial court's failure to give the jury a limiting instruction as to its use forbids sustaining defendant's conviction. In the specific context of battered woman's syndrome expert testimony, we have made abundantly clear that "[t]he jury charge must properly and completely explain how battered woman syndrome evidence may be considered in this matter. The charge here did not fulfill its obligation to be a complete and clear 'road map' for the jury." *State v. B.H.*, 183 *N.J.* 171, 201, 870 *A.*2d 273 (2005) (citation omitted). In contrast with the "narrow" and "inadequate" jury charge we condemned in *B.H.*, *ibid.*, here there was no charge at all. If a "narrow" and "inadequate" instruction concerning the proper use of battered woman's syndrome expert testimony is grounds for reversing a conviction, plain reason demands that the same result obtain with even greater force when, as here, no instruction at all is given. As the Appellate Division made clear in *State v. Ellis*, 280 *N.J.Super.* 533, 545, 656 *A.*2d 25 (App.Div.1995),

> the trial court erred in this case by failing to give the jury limiting instructions on the difference between substantive use and limited use of [the battered woman syndrome expert] testimony. The omission of limiting instructions was plain error since the jury certainly could have taken [the expert's [4]] testimony as evidence of defendant's guilt rather than the victim's credibility. Accordingly, this error was "clearly capable of producing an unjust result," and reversal and remand is warranted.

---

[4] Coincidentally, the same battered woman's syndrome expert, Dr. Kabus, testified in both *State v. Ellis* and in this case.

For that reason and that reason alone, I cannot join in the majority's conclusion that it was harmless error when, in its instructions to the jury, the trial court failed to cabin the use of the battered woman's syndrome expert testimony solely to matters relating to whether Williams's statements were to be interpreted in a manner counterintuitive to the facial import of those statements.

### III.

For the foregoing reasons, I respectfully dissent from the Court's conclusion that "the trial court properly admitted expert testimony concerning the common characteristics of battered women and battered woman's syndrome, and that the failure of the trial court to give a limiting instruction on the use of the expert's testimony was harmless error." *Ante,* 186 *N.J.* at 479, 897 *A.*2d at 320 (2006). Instead, in the circumstances presented here, I would hold the battered woman's syndrome expert testimony offered by the State to be inadmissible, I would find the trial court's admission of that evidence and its use without a proper limiting instruction to be reversible error, I would order defendant's conviction reversed, and I would remand this case to the Law Division for a re-trial.

*For affirmance in part/reversal in part/remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, and WALLACE—6.

*Concur in part/reverse in part*—Justice RIVERA-SOTO—1.