Roger ISAACS, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 21S00–9308–CR–870.

Supreme Court of Indiana.

Dec. 29, 1995.

Rehearing Denied April 9, 1996.

Susan K. Carpenter, Public Defender of Indiana and David P. Freund, Deputy Public Defender, Indianapolis, for Appellant.

Pamela Carter, Attorney General of Indiana and Suzann Weber Lupton, Deputy Attorney General, Indianapolis, for Appellee.

SHEPARD, Chief Justice.

A jury found appellant Roger Isaacs guilty of murder, Ind.Code 35–42–1–1(1), and the trial court sentenced him to sixty years in prison. We affirm.

*Facts*

Maureen Sullivan and Roger Isaacs were married in Arizona on March 12, 1983. In July of 1983, just before the birth of their first child, they moved back to their childhood home in Connersville, Indiana. The couple separated in March 1987. Roger returned to Arizona to live with his father while Maureen remained in Indiana. In July 1987, Maureen rejoined him in Arizona. About a year later, Maureen gave birth to their second child.

Roger and Maureen returned to Connersville in June 1991 with the intent of separating due to their marital problems. Roger planned to take a job and set up Maureen and the children in a house before they separated. Initially, the family lived with Roger's grandparents, but this increased marital tensions.

Following an argument in July 1991, Maureen and the children moved into her mother's home. In September, Roger and Maureen began seeing each other again in what Roger described as a "daytime friends and nighttime lovers" relationship. They accompanied each other to several parties and casual social functions throughout the remainder of 1991 and during the first part of 1992.

On July 16, 1992, Pat Sullivan, Maureen's brother, found Maureen's cold body lying on a mattress in the basement of her home. He went outside to call for help.

The Connersville Police arrived and observed Maureen face down on a mattress on the floor. The body was stiff, which meant rigor mortis had already set in. There was blood on the body, clothing and matted in the hair. On the floor, there was blood that appeared to have had something drug through it or to have been wiped up. There was also a spot on the wall which looked as though something had made contact and transferred blood to the wall. The coroner examined the body and observed numerous injuries around the back of the head, face, and legs. He also noticed a circle of hair missing from the scalp.

Teresa Sergeant, a friend of Maureen, arrived at the house and told the police that Roger had threatened to kill Maureen on several recent occasions. These remarks led to his arrest.

### I. Exclusion of Hearsay

Before Isaacs took the stand to testify in his own defense, the State asked the court to expand an order in limine to prohibit Isaacs or any other defense witness from introducing any statements made by Maureen. The court granted the motion. Isaacs' defense was self-defense. He testified in detail about the incident leading to Maureen's death and attempted to relate the conversation between them. The court permitted Isaacs to testify about what he said to Maureen but sustained objections by the State on statements made by Maureen to Isaacs.

The jury was excused, and Isaacs made an offer to prove. Isaacs said he had arranged with Maureen to visit her on the morning in question so that he could pick up and pay for some items he had agreed to buy from her. Isaacs and Maureen went to the basement to retrieve two boxes. He started carrying one of the boxes upstairs with Maureen in front of him. When Maureen reached the top of the stairs, he asked if she had contacted her attorney to see about lowering his support payments. Isaacs testified that she became angry and replied, "No, I haven't."

He also testified that when he asked Maureen if she had been drinking, she replied, "It ain't none of your business what I do," and she repeated that statement after he told

her, "Here it is seven o'clock in the morning and you're already drunk." Isaacs testified that when he asked her to get out of the way and let him leave, Maureen said, "Where you gonna go?" He told her he was going to get "as far away from her as he could." Maureen then replied, "I knew that you were going to do this." Isaacs replied, "Do what?" Maureen said, "I knew you were gonna go out there and keep the kids." Isaacs testified he then said, "I told you from the beginning, I wasn't gonna do that." Maureen replied, "I don't believe you," and then pushed on the box resulting in both of them falling to the bottom of the stairs.

Once Isaacs collected himself, he sat up and Maureen said to him, "I hate you, I hate you, I hate you!" Maureen did not say anything else to him until she was sitting on top of him, hitting him in the face. She kept saying, "I'm not going to let you take my babies!" Isaacs testified that when Maureen started choking him, he hit her on the head with a table leg four or five times to get her off of him, and when she started to back off, he pushed her as hard as he could. She hit the stairwell wall hard and landed sitting down. Isaacs explained that at this point he started to leave, but Maureen repeatedly said, "Don't leave."

The State objected to Isaacs' testimony regarding Maureen's statements on the grounds it was inherently unreliable, self-serving hearsay. Isaacs argued it was admissible to prove Maureen's state of mind. The trial court concluded that the statements could not be admitted to prove the victim's state of mind because the victim's state of mind was irrelevant to Isaacs's claim of self-defense.

 Hearsay is testimony or written evidence of a statement made out of court being offered in court as an assertion to show the truth of the matters asserted therein. *Smith v. State* (1986), Ind., 490 N.E.2d 300. It does not appear that many, if any, of the statements attributed to Maureen were offered for this purpose. They were descriptive of the circumstances presented to Isaacs which resulted in the victim's death. See, e.g., *id.* at 302. The statements the victim made to

Isaacs were as pertinent as the statements he made to her in relation to his claim of self-defense.

■ While it was probably error to exclude this evidence, we are satisfied that any error was harmless because its "impact on the jury, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." *Fleener v. State* (1995), Ind., 656 N.E.2d 1140.[1]

After all, even though Isaacs was not able to introduce the victim's exact statements, he was not prevented from presenting his defense. He testified at length about the confrontation and the victim's alleged acts of aggression. He also succeeded in telling the jury that the victim was angry and was provoked by him into a physical confrontation. Moreover, he testified that the victim had pushed him, hit him, threw things at him and attempted to choke him.

Isaacs' testimony regarding the victim's alleged comments would have done little to enhance the detailed picture painted by Isaac's own description. Excluding the victim's non-threatening statements such as, "No I haven't," "It ain't none of your business what I do," "Where you gonna go?," and "I knew you were gonna go out there and keep the kids" did little by way of substance given all the remaining evidence. After all, Isaacs admitted that he and the victim were involved in an altercation, that he beat her in the head four or five times with a table leg, and that when she started to back off he shoved her as hard as he could against the wall. Such a statement implies that the Maureen was attempting to retreat and was sufficient to allow a jury to conclude that Isaacs did not act in self-defense.[2]

Furthermore, statements made by other witnesses demonstrated that Isaacs and Maureen had an unstable relationship, and a number of friends and relatives noted that Isaacs had a volatile personality. Testimony also revealed that in the week before her death, Isaacs harassed Maureen and a friend at a party, and the victim told friends that Isaacs had threatened to kill her after their children left to visit their grandfather.

Isaacs admitted he did not call for any assistance or report the accident. Instead, he went to his grandfather's house and showered, then went to work as though nothing happened. He also admitted discarding evidence at his place of work, explaining that he hid a bag containing blood soaked clothing, towels and blankets. The items were found at his place of work, under a three-foot high stack of tarps. The bag included a pair of jeans belonging to Isaacs. In one pocket, the police found a metal ball from the table leg that was used to beat the victim and a piece of the victim's scalp and hair.

Considering the tremendous weight of the evidence, the trial court's exclusion of the victim's statements was of minimal consequence. Appellant was able to present amply his claim of self-defense and the error did not affect Isaac's substantial rights.

## II. Judicial Intervention in Closing Argument

■ Isaacs claims the trial judge invaded the province of the jury in violation of Art. I, sec. 19[3] of the Indiana Constitution while ruling on an objection during final argument.

During trial, Isaacs called a forensic pathologist, Dr. Shaku Teas, to testify concerning her review of the autopsy on Maureen conducted by Dr. Richard Harruff, the State's forensic pathologist. Dr. Teas said, "I think the cause of her death was spinal injuries." R. at 2486. As to how those

---

1. Isaac's position at trial was that the statements were admissible under the hearsay rules. Counsel on appeal seeks application of the federal constitutional harmless error standard. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We conclude that the issue is adequately addressed as one of state evidence law.

2. At the time of her death, the victim was approximately five-foot two inches tall and weighed one-hundred and six pounds, while the defendant was about five-foot ten inches tall and weighed two-hundred and twenty pounds. The jury could well have concluded that a petite, drunk victim could not have created in Isaacs a reasonable fear of death or bodily injury.

3. "In all criminal cases whatever, the jury shall have the right to determine the law and the facts." Ind. Const. art. I, sec. 19.

injuries arose, Dr. Teas stated, "the mechanism of the injury to the neck is most likely, in my opinion, a fall. A fall down the stairs." R. at 2438. She also indicated that the injuries could have resulted from being slammed into a wall. *Id.*

During closing argument, Isaacs' counsel remarked that "Doctor Teaus [sic] testified that she died from the neck injury, from the fall." R. 3245. The following exchange ensued:

MR. DEMKOVICH: Judge, I'm gonna object to that. The doctor [Dr. Teas], the question [that] was asked by Miss Crispin [co-prosecutor] was, Doctor, can you say death wouldn't have resulted by uh, for cause other than the spinal cord injury? She said, I couldn't rule that out. I think that's an improper statement as to what Doctor Teaus [sic] said.

MR. URDAL: I don't think it's improper Judge. She [Dr. Teas] said that Maureen died from a fall (inaudible).

JUDGE: She said that she died from the fall, but she also said that she could have died from something, something else could have been a cause. I mean she said both ways. Her opinion was that she died as the result of a fall, from a spinal cord injury, but she could not rule out other possible causes.

R. at 2805. Isaacs' counsel then continued his closing statement.

During a break, and outside the presence of the jury, the judge consulted with counsel about any possible misconception regarding the prosecutor's objection and the judge's response to it. After this conference, the jury returned to the courtroom and the judge said:

JUDGE: Ladies and gentlemen, during a portion of Mr. Urdal's closing argument he uh, there was an objection by Mr. Demkovich. As Mr. Urdal indicated to you earlier, we added some instructions at the last minute about some additional crimes, and I think uh, and I'm not sure what I said, although, and I may have misspoken myself concerning the testimony of Doctor Teaus [sic]. Doctor Teaus [sic], whatever I said earlier, or whatever Mr. Urdal may have said, or Mr. Demkovich said, to correct what I may have said earlier, was Doctor Teaus [sic] said that her cause of death was a spinal cord injury. That was her number one cause of death. When asked if she, if there were other possible causes of death, she said she could not rule those out, other causes of death out. She also said that the spinal cord injury could have been a result, and it may have been, and there's some dispute, and I'm not sure what she said at this point, that it may have been, and I think one point she said most likely is [sic] was the result of the fall, but then she said that it may have been as the result of being pushed up against the wall, or being hit on the head with the object that's in front of you, or some other possible reason. So she basically said that while she thought it might have been a result of the fall, there was other reasons for the possible spinal cord injury. So with that correction uh, Mr. Urdal you may continue.

R. at 3264–65. The judge also allowed defense counsel to indicate to the jurors that they could request to hear a play-back of both doctors' testimony. The court gave a final instruction saying: "Nothing that I said during the trial was intended as any suggestion of what facts or what verdict you should find. Each of you, as jurors, must determine the facts and the verdict." R. at 232.

Isaacs did not object to the judge's response to the prosecutor's objection or to the judge's later clarifying statement to the jury, either before the jury, during the private consultation with counsel, or otherwise. Accordingly, there is no error preserved for appeal.

### III. Battered Woman's Syndrome Evidence

During its rebuttal, the State called Dr. Ned Esbaum, M.D., a psychiatrist, to testify about battered woman's syndrome. After the prosecutor asked Dr. Esbaum to explain what battered woman's syndrome was, Isaacs' counsel objected: "Objection, irrelevancy for this case. There's been no foundation laid for this testimony. I assume that he [Dr. Esbaum] has not examined or inter-

viewed with the, either Maureen Isaacs, or Roger Isaacs in this case." R. at 3156. The prosecutor responded by stating that the testimony was:

> relevant because it is going to be direct rebuttal to the motivation that the Defendant would have the jurors believe as to relationship between the defendant and his wife during the past months, more over [sic] during the last year of their marriage, up to the time of her death. The doctor is here today in order to explain to the jurors a psychiatrically recognized in its own scientific field phenomena that will offer and [sic] alternative to her motivation for the actions that they themselves have put into evidence.

R. at 3157.

After the prosecution had established that Dr. Esbaum had neither heard any testimony nor spoken to Maureen or Roger Isaacs or any other witnesses, defense counsel stated:

> Well, Judge, I'd have no objection to the testimony if they had some relevance to this case, but uh, the State is attempting to use this witness simply to provide a theory of the case, and it's not going to be based on any of the facts that are in this specific case.

R. at 3158. The court ruled that the testimony was relevant because "as I understand the State they intend to bring this witness in to refute, rebut, or at least to explain why a woman who has been allegedly battered would continue to go back to, and have an affair with the individual who was doing the battering." R. at 3159. The court permitted the testimony. His testimony was quite elaborate, describing the wife as dependent on the husband, while the husband is a "man [who] sets up this relationship with the wife in which he very aggressively takes out all of his frustrations on her." R. at 3160.

The scope of rebuttal is a matter within the trial court's discretion and the alleged admittance of irrelevant evidence on rebuttal is reviewed under the abuse of discretion standard. *Berkley v. State* (1986), Ind., 501 N.E.2d 399, 400 (citing *Wells v. State* (1982), Ind., 441 N.E.2d 458). Additionally, "[r]ebuttal evidence is limited to that which tends to explain, contradict, or dis-

prove evidence offered by the adverse party." *Id.* (citing *Steele v. State* (1985), Ind., 475 N.E.2d 1149).

As the Michigan Supreme Court has pointed out, "[i]n most cases, the battered woman syndrome is offered by the defendant in a case of homicide in which the defendant is claiming self-defense." *People v. Christel,* 449 Mich. 578, 537 N.W.2d 194, 200 (1995). Expert testimony of battered woman's syndrome introduced against the husband/defendant has been held admissible, however, so long as it is relevant. *See id.* 537 N.W.2d at 201–05.

During his direct examination, Isaacs characterized his relationship with Maureen as "daytime friends and nighttime lovers." R. at 2071. The State's purpose for introducing Dr. Esbaum's testimony was to refute the notion that Isaacs and Maureen had a friendly relationship prior to her death. This testimony could have reasonably discredited Isaacs' attempt to bolster his accident/self-defense theory by allowing the jury to conclude that their relationship was not rosy, thereby casting doubt on Isaacs' assertion that he would not have intended to kill Maureen.

We therefore conclude that the trial court was within the range of its discretion to decide that this testimony was relevant and that its prejudicial effect did not outweigh its probative value.

## IV. Recalling the Defense Pathologist

Mr. Isaacs was arrested on July 17, 1992. He requested a speedy trial on August 19 making October 28 the latest possible trial date. Discovery was to be completed by September 1, but Isaacs refused to divulge his defenses. It was not until September 24 that Isaacs filed a motion requesting the State to provide a chemical analysis of the victim's blood. From this discovery request, Isaacs learned that the victim's blood was tested for alcohol, but for nothing else. Thus, on September 30, Isaacs filed another motion requesting that the victim's blood be tested for chemical substances.

The court held a hearing on October 8 to determine whether to order additional testing. The State objected to Isaacs' motion and requested that he reveal how the chemical substance evidence would be relevant. Isaacs refused to reveal his defenses. The trial court denied the defense motion until Isaacs was willing to make a showing of materiality.

On October 13, Isaacs filed an amended motion in which he revealed his defenses and how the information was material to them. The motion was granted. At a hearing on October 19, the court indicated that it had made arrangements with a laboratory in Indianapolis to conduct the tests. According to Isaacs, he first learned of the need to specify which drugs he wanted tested during a deposition of Dr. Harruff on October 15. The trial began on October 28, before the test results were complete. The results were not available until after Dr. Teas, the pathologist called by Isaacs, was released as a witness.

When the results became available, Isaacs attempted to recall Dr. Teas. According to Isaacs' offer of proof, Dr. Teas would have testified that the level of Ephedrine in the victim's blood should have been listed as a contributing cause of death. Noting Isaacs' earlier refusal to indicate why the defense required the testing, the court found Isaacs' own delay and failure to comply with the discovery requirements had solely led to the need for the request.

During Isaacs' examination of Dr. Michael Evans, a defense toxicologist, counsel asked whether he was "qualified to . . . tell the jury whether this dosage contributed to death" The State objected, asserting that defense counsel had not laid a proper foundation. Appellant withdrew the question. When Isaacs renewed his request to recall Dr. Teas, the trial judge denied the request and noted that, "[Dr. Evans] said he can make that determination. You didn't bring it out from him." The court noted that Evans could have provided the same testimony.

■ Isaacs claims the trial court denied his constitutional right to present evidence by refusing to allow the recall of Dr. Teas. Indiana Rule of Evidence 611(a) explains that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Ind.Evidence Rule 611(a). The trial judge is provided wide latitude to control the flow of the trial proceedings. This includes discretion to determine the order of proof and the presentation of evidence. In *Wray v. State* (1989), Ind., 547 N.E.2d 1062 we held: "The trial court has broad discretion in determining the order of proof and in controlling trial proceedings. The recall of witnesses to correct or add testimony due to mistake or oversight is [also] within the sound discretion of the trial court." *Id.* at 1066 (citations omitted). Rulings of this nature may be based in part on a court's assessment of a party's own behavior and compliance with pre-trial orders. *See, e.g., Wiseheart v. State* (1986), Ind., 491 N.E.2d 985.

■ In the instant case, Isaacs' own inaction and refusal to comply with the rules of discovery delayed the test results. Moreover, Dr. Teas' testimony was not vital to Isaacs' case. Isaacs could have presented identical testimony through another witness.

We cannot say that the trial court abused its discretion when it refused to permit Isaacs to recall Dr. Teas as a witness. It certainly did not violate Isaacs' Sixth Amendment rights.

### V. Admission of Coroner's Videotape

Before the presentation of evidence, the parties discussed admissibility of a videotape of the coroner's examination of the victim's body at the crime scene. Isaacs did not object to the video being shown, but he urged that it be stopped at the point where the coroner turned the body over and examined the injuries to the victim's head, neck and arms. The State argued that since Isaacs was claiming that some of the injuries were the result of an accident and self-defense, it was important for the jury to see the injuries that were visible.

The trial judge reviewed the tape and took the question under advisement until he could see how the evidence developed. When it came time to rule on admissibility, the judge explained that the still photographs did "not depict the facial wounds as well as the videotape, partly because the videotape was able to zoom in and [show] the coloration much better." In light of appellant's claims of accident and self-defense, the trial judge concluded that it was necessary for the jury to view the entire video. On appeal, Isaacs argues that it was prejudicial error to submit the entire videotape to the jury.

 Admission of photographs and videotapes lies within the sound discretion of the trial court, and its ruling will not be disturbed absent an abuse of that discretion. *Green v. State* (1992), Ind., 587 N.E.2d 1314. The fact that a photograph or videotape may depict gruesome details of a crime is not a sufficient basis for excluding it. *Elliott v. State* (1994), Ind., 630 N.E.2d 202 at 204. The question is whether its probative value outweighs its prejudicial effect. *Mitchell v. State* (1990), Ind., 557 N.E.2d 660–665.

 In light of Isaacs' claims of accident and self-defense, it was reasonable for the trial judge to conclude the videotape assisted the jury in assessing the nature and extent of the victim's injuries, and in ascertaining whether they were deliberate or the result of accident. Moreover, the videotape was relevant because it illustrated the testimony of both the pathologist and the coroner.

The tape was not unduly gruesome, nor was its prejudicial impact excessive compared to its probative value. We conclude the court exercised appropriate discretion in admitting the entire videotape.

### VI. Change of Judge

Isaacs moved for a change of judge, based on statements Judge Pflum made to Isaacs' family immediately after a guardianship hearing concerning the Isaacs children. According to Isaacs' affidavit and an attached unsworn letter from two members of Isaacs'

family, the judge described the evidence offered at the probable cause hearing, indicated a change of venue from the county might be requested due to pre-trial publicity, and said he had read a letter from Isaacs. This affidavit and the unsworn letter were the only evidence in support of the motion. During the hearing on the motion, Judge Pflum confirmed that the conversation occurred, confirmed some details and contradicted others, indicated he had not really read the letter and declared that he harbored no prejudice toward Isaacs. He denied the motion.

 Under the provisions of Criminal Rule 12 relating to change of judge for cause as they existed at the time of Isaacs' trial, we presumed a judge was unbiased and unprejudiced. *Stanger v. State* (1989), Ind.App., 545 N.E.2d 1105. A trial judge's ruling on a motion for a change was reviewed under the abuse of discretion standard. *Harrison v. State* (1995), Ind., 644 N.E.2d 1243. Under this standard, Isaacs' affidavit did not make out a sufficient demonstration of prejudice to command granting the motion. Subsequent rulings during trial do not appear to build a particularly stronger case of prejudice than that presented in the affidavit. We conclude there was no error.

### VII. The Sentence

 In imposing a sixty-year sentence the trial court found eight aggravating circumstances and two mitigating circumstances. These included the physical infirmity and defenselessness of the victim, the imposition of some sixty wounds on the victim, and Isaacs' violation of a protective order.[4] The mitigating circumstances included Isaacs' lack of a prior criminal record and his age (29).

While certain of the other aggravators cited by the trial court were entitled to little weight, we cannot say that the sentence imposed by the trial court is manifestly unreasonable. Ind.Appellate Rule 17(B)(1).

---

4. Actually, the protective order had apparently expired by the time Roger Isaacs killed his wife. Still, its existence and obvious lack of impact on

Isaacs' behavior made it appropriate as an aggravating circumstance.

*Conclusion*

We affirm the judgment of the trial court.

DeBRULER, SULLIVAN and SELBY, JJ., concur.

DICKSON, J., dissents, disagreeing with the majority as to Parts I, IV, and VI.