## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 06 2016, 7:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Jennifer L. Koethe<br>La Porte, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana |
| | Karl M. Scharnberg<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Bradley Arndt,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | July 6, 2016<br><br>Court of Appeals Case No.<br>46A05-1509-CR-1536<br><br>Appeal from the La Porte Superior Court<br><br>The Honorable Michael Bergerson, Judge<br><br>Trial Court Cause No.<br>46D01-1411-MR-280 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Bradley M. Arndt (Arndt), appeals his conviction for murder, a felony, Ind. Code § 35-42-1-1(a).

We affirm.

## ISSUES

Arndt raises two issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion by excluding Arndt's videotaped police interview from evidence; and

(2) Whether the trial court abused its discretion in sentencing Arndt.

## FACTS AND PROCEDURAL HISTORY

Arndt, born on October 22, 1967, and his two older brothers, Jeff Arndt[1] and Thomas Arndt (Thomas), grew up in Trail Creek, LaPorte County, Indiana. The Arndt brothers had a "hard" childhood—with a father who "drank a lot and took it out on the kids." (Tr. p. 188). Arndt, in particular, struggled as he was "picked on" by students at school and other children in his neighborhood. (Tr. p. 188). In addition, Arndt and his brothers never had a "normal, regular brotherly relationship." (Tr. p. 189). Rather, there was "lots of yelling and screaming and threatening each other." (Tr. p. 190).

---

[1] In 1992, Jeff Arndt was involved in a car accident and has been residing in a nursing home ever since.

During Arndt's childhood, other families in the neighborhood observed that Arndt appeared to suffer from mental health issues. As one neighbor, Tony Thomas (Tony), described,

> [W]e would call him weirdly, because he one minute was just a kid walking down the street and the next minute he'd walk and make the faces and we would see him. He would stand in his yard and pretend to do karate or Tai chi or something, and then next minute he's wandering being himself.

(Tr. p. 231). Additionally, in the middle of conversations with his neighbors, Arndt would appear to lose touch with reality. During these episodes, Arndt would get a glazed look in his eyes, and his demeanor "would just change." (Tr. p. 243). Arndt would express his beliefs that "the police [were] after him all the time" and would also talk about "dating porn stars and going and walking down the street and getting picked up by rock bands." (Tr. p. 215). Arndt also experienced severe mood swings and episodes of rage. During his angry outbursts, he would punch holes in walls and get into physical fights. As a teenager, Arndt began hearing strange voices in his head.

Even after he reached adulthood, Arndt never moved out of his parents' home. In 2001, Thomas and Arndt's father died, and in 2006, their mother died. On September 12, 2006, Thomas contacted Adult Protective Services (APS) and reported that Arndt "is mentally unstable and physically handicap[ped] with leg and back trouble." (Defendant's Exh. A, p. 1). Thomas reported that their mother had just passed away, and she had always cared for Arndt. Thomas asked APS "what kind of help he can get [for Arndt], as he has no means to

support him." (Defendant's Exh. A, p.1). The next day, APS conducted a home visit. Arndt stated to APS that his physical pain prevents him from working, and that his pain is the result of "chicks put[ting] him on the back of their motorcycles and throw[ing] him off." (Defendant's Exh. A, p. 2). Arndt further stated that "people are out to get [him]" and that "people like to run into [his] legs with their cars." (Defendant's Exh. A, p. 2). Following his interview with APS, Arndt was in agreement that Thomas would make an appointment and take him to a mental health facility for an intake assessment. It is unclear whether Arndt ever obtained a mental health assessment.

[7] Following their mother's death, Thomas inherited her house, which was not subject to a mortgage. For the next eight years, Arndt lived in the house alone while Thomas paid for the utilities. Thomas would visit Arndt "quite often[,]" during which times there was always "[l]ots of yelling and fighting." (Tr. p. 191). For a few years, Arndt worked at a fast-food restaurant, but he was largely unemployed. As Arndt was denied social security disability benefits, his sole income consisted of $195 per month in food stamps.

[8] On August 14, 2014, Thomas contacted APS and reported that Arndt "is delusional and states that everyone is out to get him." (Defendant's Exh. A, p. 6). Thomas indicated that he had not visited Arndt for several months because Arndt "is usually pretty upset and yells at him." (Defendant's Exh. A, p. 6). When Thomas did finally visit, he found both the home and Arndt to be filthy. A water heater leak had caused the floors to flood and buckle. In addition, when Thomas visited, Arndt "was irritable and irate with [him]." (Defendant's

Exh. A, p. 7). Thomas informed APS that "he always carries his gun when he visits [Arndt] because he never knows how [Arndt] will react or what [Arndt] is capable of doing[,]" and Arndt "has threatened [Thomas] and [Thomas' wife, Nikki Arndt (Nikki),] with harm in the past." (Defendant's Exh. A, p. 7). Finally, Thomas reported that he was concerned that Arndt would lose his housing because the real estate taxes had not been paid in several years. APS concluded that its involvement did not "seem beneficial or appropriate" at the time and that it "would be a potentially dangerous situation for [APS] investigators." (Defendant's Exh. A, p. 7). Thus, APS instructed Thomas that he should request that the police conduct a welfare check.

[9] In September of 2014, Thomas could no longer afford to pay for the utilities for Arndt. As a result, Thomas had the utility services disconnected. In addition, Thomas had not paid the property taxes and believed that the house would soon be put up for a tax sale. Thomas wanted to sell the house, and he had "[m]any" discussions with Arndt about finding a new place to live because they were going to sell the house. (Tr. p. 303). Thomas intended to give the proceeds of the sale to Arndt, and although Thomas found an interested buyer, the sale was never completed because Arndt refused to vacate the house.

[10] In November of 2014, the temperature dropped to below freezing, and Arndt was living in the house without any heat. In order to keep his feet warm, Arndt wrapped them with alternating layers of plastic bags and socks. Arndt's neighbor, Tony, provided Arndt with extra blankets, food, water, and batteries. On November 19, 2014, Tony called APS to report that Arndt "is mentally ill

and living in a home with no heat or water." (Defendant's Exh. A, p. 12). Tony stated that he was "very worried that something bad is going to happen to [Arndt] if he continues to stay in the home." (Defendant's Exh. A, p. 12).

[11]     On November 20, 2014, APS—with the assistance of Trail Creek Police Department Chief Marshal Steven Dick (Marshal Dick)—conducted another home visit. Upon APS' arrival, Arndt explained that even though he had no income to pay for utilities, "he was fine and no one needed to be concerned about him." (Tr. p. 420). However, the home inspection revealed deplorable living conditions. The house was filled with a smoky haze from a lack of ventilation; there was mold on the walls; the floors were buckled and squishy; there were dishes on the counter that were covered with mold; the water heater was sinking through the floor; and "there was an odor of sewage in the house." (Tr. p. 161). There were four "very dirty" mattresses stacked up in the living room, which is where Arndt had been sleeping. (Tr. p. 422). In the bathroom, there was a garbage can placed on top of the toilet, which Arndt described that he had been "us[ing] to go to the bathroom and he just hadn't emptied it yet." (Tr. p. 162). Marshal Dick explained to Arndt that it was unsafe for him to continue living there, and they discussed his options for staying at a homeless shelter.

[12]     Based on Arndt's complaints of pain in his back, shoulder, and leg, an ambulance was summoned. When the paramedics arrived, Arndt stripped the layers of socks and bags off his feet. His feet were extremely white, and the smell was so foul that Marshal Dick was forced to exit the room. Arndt agreed

to go to Saint Anthony Memorial Hospital in Michigan City, Indiana, for an examination. At the hospital, Arndt was treated for frostbite and cellulitis. Marshal Dick left a message for Thomas to inform him that Arndt had been taken to the hospital and advised to sleep at a homeless shelter.

[13] Following the welfare check, APS concluded that Arndt "was alert and oriented and appeared able to direct his own care. [Arndt] may have some mental illness, but [he] denied any mental health diagnosis." (Defendant's Exh. A, p. 14). Ultimately, APS determined that Tony's allegation of self-neglect was "unsubstantiated as [Arndt] does not appear to be an endangered adult." (Defendant's Exh. A, p. 14). Furthermore, during his hospital stay, Arndt received a mental health consultation. Dr. Robert Raster, a psychiatrist, concluded that Arndt, although suffering from "mild paranoia[,]" "most likely has more of a chronic personality disorder with apparent personality flavor. He does not have any outright psychotic symptoms and has no desire to take psychotropic medication. He is not dangerous, threatening himself or others." (State's Exh. 141). On November 22, 2014, Arndt was discharged from the hospital. Contrary to the advice of social workers to avail himself of a homeless shelter, Arndt returned to his house.

[14] On November 23, 2014, Thomas and Nikki—believing that Arndt had been instructed not to return home—planned to secure the house. Before arriving at the house, Thomas and Nikki learned that Arndt had, in fact, gone home. Anticipating a confrontation, Nikki offered to call the police, but Thomas indicated that they would wait to see if Arndt got "riled up" before involving

the police. (Tr. p. 325). When Thomas and Nikki pulled into the driveway, they observed Arndt standing in the open doorway. Thomas grabbed his gun out of the console and put it in his pocket. Thomas approached the house, and Nikki heard Thomas inform Arndt that "it's time to go, this is ending. I got to get rid of this house, it's going up for tax sale." (Tr. p. 313). Arndt retreated into his house, only to return a few moments later with a samurai sword. Without any hesitation, Arndt plunged the sword into Thomas' body, repeatedly stabbing him in the neck, chest, abdomen, and forearm. Thomas stumbled to the ground, and as Arndt stood over him with the sword, "his eyes were all glazed." (Tr. p. 200). Arndt was also reportedly growling.

[15] Several neighbors were outside at the time, and they witnessed the entire event. One neighbor heard Thomas yell that "he's stabbing me" and immediately contacted the police. (Tr. p. 274). After realizing that the brothers' argument had escalated, Tony had rushed over and pulled Arndt away from Thomas. Tony also restrained Nikki after she retrieved the gun from Thomas' pocket and was aiming it at Arndt. As Arndt walked away from Thomas, he had a smirk on his face but subsequently "went to a flat affect and then walked away." (Tr. p. 339). At one point, Arndt turned the sword in a manner indicating that he intended to stab himself, but Tony convinced him to put the weapon down. Arndt acquiesced and stuck the sword into the ground. Arndt then sat down on the ground, with the glazed look still in his eyes. According to Tony, after Arndt sat down, his face began returning to normal, at which point he started

"rocking back and forth" and asked, "[W]hat did I do? I don't remember, what [did] I do?" (Tr. p. 219).

[16] Nikki's mother, a registered nurse, had driven by the house during the altercation, and she rushed to render aid to Thomas. Thomas was bleeding significantly, and Nikki's mother attempted to hold pressure on his wounds until the paramedics arrived. The stab to Thomas' neck caused injuries to the thyroid gland, trachea, and left jugular vein. The sword also sliced through the abdominal cavity and cut into the left kidney. When Arndt plunged the sword into Thomas' flank to a depth of twenty-four inches, it cut through the aorta, the inferior vena cava, the right kidney, and the colon. Finally, the stab to the forearm dislocated Thomas' elbow and cut through the brachial artery and vein before exiting Thomas' upper arm. Thomas was transported to a hospital, where he succumbed to his injuries.

[17] On November 24, 2014, the State filed an Information, charging Arndt with murder, a felony. Within a few weeks after arriving at the LaPorte County Jail, Arndt expressed some suicidal thoughts and was accordingly placed on suicide watch. The jail's physician examined Arndt and thought he was "possibl[y] bipolar and . . . fairly stable at [the] time." (Tr. p. 540). The doctor prescribed medications to treat Arndt's depression and anxiety. The doctor explained that the antidepressants prescribed to Arndt may also be "used for other mood stabilization" issues. (Tr. p. 545).

[18] On January 16, 2015, Arndt filed a Motion for Determination of Competency to Stand Trial, which the trial court granted the same day. The trial court subsequently appointed two psychologists, Dr. Clifton Titus (Dr. Titus) and Dr. John Heroldt (Dr. Heroldt), to conduct a "comprehensive evaluation" of Arndt regarding his competency to stand trial. (Appellant's App. pp. 26, 28). On March 26, 2015, Arndt filed notice with the court of his intent to rely on "the defense of mental disease or defect as set out in [Indiana Code section] 35-41-3-6." (Appellant's App. p. 35). On May 21, 2015, the trial court requested that Dr. Titus and Dr. Heroldt also "make a comprehensive evaluation of [Arndt] regarding whether he had a mental disease or defect at the time of the commission of the crime, whereby he would be unable to appreciate the wrongfulness of his conduct at the time of the offense (sanity/insanity)." (Appellant's App. pp. 27, 29). In addition, on July 8, 2015, the trial court appointed a psychiatrist, Dr. Kumud Aggarwal (Dr. Aggarwal), "to evaluate [Arndt] and whether he was legally insane at the time he committed the murder." (Appellant's App. p. 88).

[19] On June 17, 2015, Arndt filed a motion to suppress the statements he made during his videotaped police interview following his arrest, arguing that the interrogation violated his *Miranda* rights. On July 17, 2015, the trial court held a hearing on the motion. The Stated indicated that it did not object, and the trial court granted Arndt's motion to suppress his police interview.

[20] On July 20 through 23, 2015, the trial court conducted a jury trial. Following the State's and Arndt's cases-in-chief, the trial court's expert witnesses—*i.e.*, Dr.

Titus, Dr. Aggarwal, and Dr. Heroldt—testified. All three doctors concluded that Arndt was competent to stand trial. Dr. Titus and Dr. Aggarwal both diagnosed Arndt with paranoid schizophrenia. According to Dr. Titus, at the time of his examination, Arndt knew that it was wrong to kill Thomas because it was not justified by self-defense, and Arndt specifically stated that he "didn't mean for him to die." (Tr. p. 581). Although Dr. Titus opined that Arndt's schizophrenia "probably played a role in what happened that night[,]" Dr. Titus could not conclude with any certainty whether Arndt knew right from wrong *at the time* of the killing. (Tr. p. 585). Similarly, Dr. Aggarwal stated that Arndt knew that "murder is wrong, [except] when it is in self-defense and [he said that] it was not self-defense." (Tr. p. 677). Arndt had a "complete recollection" of the incident, and Arndt very clearly stated that his intent was not to kill, but rather to "maim," Thomas. (Tr. p. 664). While Arndt indicated that he knew right from wrong at the time, Dr. Aggarwal stated that "you can never know for sure[] because we don't have a crystal ball." (Tr. p. 683). Dr. Heroldt determined that Arndt "was not insane at the time of the offense." (Tr. p. 729). In fact, although Dr. Heroldt stated that he was not asked to diagnose Arndt, he indicated that he did not believe that Arndt suffered from a mental illness on November 23, 2014.

[21] In response to the experts' opinions as to Arndt's mental state at the time he stabbed Thomas, Arndt sought to introduce his videotaped police interview as rebuttal evidence. The State objected, arguing that it was improper rebuttal evidence and that Arndt should have admitted the video during his case-in-

chief. Furthermore, in light of the fact that Arndt had successfully moved for the suppression of the interview prior to trial, the State contended that Arndt was "trying a backdoor, which basically prevented the State from cross-examining these experts as to this evidence." (Tr. p. 761). The trial court denied Arndt's request to admit the evidence, finding that the videotape "could have been presented, because it is [Arndt's] burden of proof to present that evidence during [his] case. [He] failed to do that." (Tr. p. 772). The trial court also indicated that its admission would be an "unfair surprise on the State." (Tr. p. 777). At the close of the evidence, the jury rejected Arndt's insanity defense, instead returning a verdict of guilty, but mentally ill at the time of the offense. The trial court entered a judgment of conviction on the same. On August 27, 2015, the trial court held a sentencing hearing and ordered Arndt to serve sixty years in the Indiana Department of Correction, fully executed, "after being treated by the Indiana Department of Mental Health." (Appellant's App. p. 278).

[22] Arndt now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Admission of Evidence*

[23] Arndt first claims that the trial court abused its discretion by denying the introduction of his videotaped police interview into evidence. Trial courts are vested with broad discretion in determining whether to admit or exclude evidence. *Satterfield v. State*, 33 N.E.3d 344, 352 (Ind. 2015). A trial court's decision to admit or exclude certain evidence is subject to review only for an

abuse of discretion. *Id.* On appeal, "[w]e consider all the facts and circumstances surrounding the trial court's decision to determine whether it is 'clearly against the logic and effect' of what those facts and circumstances dictate." *Id.* (quoting *Blount v. State*, 22 N.E.3d 559, 564 (Ind. 2014)). We "'may affirm a trial court's judgment on any theory supported by the evidence.'" *Id.* (quoting *Clark v. State*, 808 N.E.2d 1183, 1188 (Ind. 2004)). Even if we find that the trial court abused its discretion by excluding evidence, such error will be "disregarded as harmless error" unless it "affect[s] the substantial rights of a party." *Hubbell v. State*, 754 N.E.2d 884, 890 (Ind. 2001).

[24] Arndt contends that his police interview should have been admitted as rebuttal evidence to the court's mental health witnesses. Because Arndt raised an insanity defense, the court-appointed experts were statutorily required to testify "follow[ing] the presentation of the evidence for the prosecution and for the defense, including the testimony of any mental health experts employed by the state or by the defense." I.C. § 35-36-2-2(c). Thereafter, "[t]he mental health witnesses appointed by the court may be cross-examined by both the prosecution and the defense, and each side may introduce evidence in rebuttal to the testimony of a mental health witness." I.C. § 35-36-2-2(e). It is well established that "[r]ebuttal evidence 'is limited to that which tends to explain, contradict, or disprove evidence offered by the adverse party.'" *Schwestak v. State*, 674 N.E.2d 962, 964 (Ind. 1996) (quoting *Isaacs v. State*, 659 N.E.2d 1036, 1041 (Ind. 1995), *cert. denied*, 519 U.S. 879 (1996)).

[25] Arndt specifically asserts that the police interview

was offered to rebut the [c]ourt's mental health witnesses' testimony by showing [Arndt's] state of mind at or near the time of the offense which had been called into question by those witnesses. The evidence was also offered to rebut the testimony of Dr. Agg[a]rwal as to whether [Arndt] understood what he was doing at the time of the offense considering he remembered everything.

(Appellant's Br. p. 10) (citation omitted). Arndt further argues that the police interview

would have been the jury's best evidence as to [Arndt's] paranoid schizophrenia in close proximity to the incident prior to being medicated, it would have shown his confusion and would have explained why it was necessary for Dr. Agg[a]rwal and Dr. Titus to have additional information from the time of the offense to consider in the evaluation process. It would also have contradicted Dr. Heroldt's findings that [Arndt] did not have a mental illness at the time of the incident.

(Appellant's Br. p. 11). As noted by Arndt, the trial court excluded his rebuttal evidence "without ever reviewing what was contained in the video-taped statement to determine its relevance." (Appellant's Br. p. 12). Instead, the trial court excluded Arndt's police interview based simply on the fact that Arndt failed to present the evidence during his case-in-chief, as well as because the evidence had been suppressed, upon Arndt's motion, prior to trial and its admission would be an "unfair surprise on the State." (Tr. p. 777).

[26] We disagree with the trial court that Arndt was necessarily required to present the police interview as evidence of his insanity during his case-in-chief. Rather,

Arndt had a statutory right to present evidence specifically intended to "explain, contradict, or disprove" the experts' opinions. *Schwestak*, 674 N.E.2d at 964 (quoting *Isaacs*, 659 N.E.2d at 1041); *see* I.C. § 35-36-2-2(e). Arndt posits that in the police interview, he described delusional incidents of

> being run over by a vehicle, being shot up with drugs twice to blot out his memory, dating a girl who was Terry Bradshaw's (former NFL quarterback) daughter and a confrontation with LaPorte police officers where they taunted him, calling him a cripple. This evidence clearly contradicts Dr. Heroldt's findings that [Arndt] did not have a mental illness at the time of the incident, the testimony of Dr. Agg[a]rwal as to whether [Arndt] understood what he was doing at the time of the offense considering he remembered everything[,] and the evidence presented by the [c]ourt's mental health witnesses regarding [Arndt's] state of mind at or near the time of the offense which had been called into question.

(Appellant's Reply Br. p. 2) (citation omitted).[2] Accordingly, we find that the trial court should have considered whether the proffered evidence served to contradict the experts' testimony prior to excluding it. Nevertheless, notwithstanding the State's alternate contention that the trial court properly excluded the evidence based on the fact that it would have constituted an unfair

---

[2] Arndt also contends that the trial court should have admitted the police interview because it "was similar to" the lay witness testimony of Tony and another neighbor, "who testified that [Arndt] had a glazed look in his eyes at the time of the incident or was in a daze or a fog similar to when he was delusional." (Appellant's Reply Br. 3). We find no merit in this argument. To the extent that Arndt sought to admit the evidence to strengthen the credibility of the lay witness testimony, it should have been done in his case-in-chief as it would not serve to "explain, contradict, or disprove" the experts' opinions as rebuttal evidence. *Schwestak*, 674 N.E.2d at 964 (quoting *Isaacs*, 659 N.E.2d at 1041).

surprise on the State, we find that any error in the trial court's exclusion of the evidence amounts to harmless error.

[27] "Harmless error is an error that does not 'affect the substantial rights of a party.'" *Littler v. State*, 871 N.E.2d 276, 278 (Ind. 2007) (quoting *Thomas v. State*, 774 N.E.2d 33, 36 (Ind. 2002)). When considering whether an error is harmless, we consider "the likely impact of the evidence on the jury.'" *Id.* (quoting *Witte v. Mundy*, 820 N.E.2d 128, 135 (Ind. 2005)). Here, we find that the evidence contained in the recorded interview actually provides additional support for the jury's verdict of guilty, but mentally ill at the time of the murder.

[28] Throughout his interview, Arndt discussed numerous paranoid delusions with the interviewing officers. It is apparent that Arndt believed himself to be the target of a number of conspiracies that involved the police and his brother, Thomas. For example, Arndt stated that Thomas has instructed people to "run [him] down" with their vehicles and has "had crazy women" give Arndt motorcycle rides, only for him to be thrown off the back. (Defendant's Exh. C, 4:49, 5:16). Arndt also believed that, in one instance, he was run over by a vehicle and was subsequently "shot up with drugs twice" in an attempt to erase his memory of the event. (Defendant's Exh. C, 35:40). Arndt further claimed to have been caught in the middle of a child pornography scandal as a child, which he believed to be the catalyst for all of his subsequent troubles in life.

[29] Despite his delusional ramblings, Arndt clearly discussed the events surrounding Thomas' stabbing during his police interview. Arndt explained

that when Thomas arrived at the house that day, they "were talking normally at first." (Defendant's Exh. C, 30:30). Arndt recalled Thomas speaking about the fact that "the county and the state was getting on his ass about the property and . . . the property taxes . . . ." (Defendant's Exh. C, 30:30-31:00). However, when Arndt tried to discuss the matter of his ongoing unemployment, Thomas instead yelled, "I don't wanna hear about that shit . . . you're just going, you're, you're out of here." (Defendant's Exh. C, 46:20). Arndt stated that he "had no idea where [he] was gonna go." (Defendant's Exh. C, 46:20). When Arndt considered Thomas' threat of eviction, in combination with "all this stuff from the past[,]" Arndt claimed that he "just snapped"; "just lost it"; and "just went berserk." (Defendant's Exh. C, 6:30, 39:54, 44:15, 46:20). He went inside and retrieved the sword that he kept at his bedside. When he returned, Arndt did not say anything to Thomas; he "just started stabbing" and kept "going at him." (Defendant's Exh. C, 39:59, 40:04). Arndt remembered that after he cut Thomas' hand, Thomas "swung a fist at me. He did pop at me. . . . Of course he's gonna fight back, I mean I got a weapon, you know." (Defendant's Exh. C, 42:38). Arndt stated that he stopped stabbing Thomas "[c]uz he went down, I mean. I didn't want to see him with all the blood,[3] and I just looked and I thought, I thought what I'd done." (Defendant's Exh. C, 40:31). When asked

---

[3] We note that this portion of the video is difficult to hear. Upon the court's review, it sounds as though Arndt said that he "didn't want to see him with all the blood"; whereas, the State heard him say, "I seen all the blood." (State's Br. p. 18).

if he had comprehended what he had done, Arndt answered, "Yes." (Defendant's Exh. C, 40:46).

[30] Arndt explained that after Thomas had fallen, he stuck the sword in the ground. He recalled that "Nikki had that gun. I almost was gonna charge at her. Just so she could blow me away. I almost don't wanna live anymore. What I've been through in my life, I, I just feel as though I don't wanna live anymore." (Defendant's Exh. C, 41:21). When he turned the sword on himself in a suicidal motion, Arndt recognized that it was Tony who "talked [him] down." (Defendant's Exh. C, 41:56). Arndt repeatedly indicated that he had "done a horrible thing," and he was aware that he was "gonna be punished for it." (Defendant's Exh. C, 12:35). Arndt began crying as he stated that he "might of killed" Thomas, knowing that he had stabbed him "in the side and the throat." (Defendant's Exh. C, 31:59, 33:58). Arndt, still in tears, insisted that "[i]t wasn't intentional. But it became that as something within me that just the, the rage that just caught, came out of me. Driven to kill. Or attempt to." (Defendant's Exh. C, 44:15). Arndt admitted that he had a lifelong hatred of Thomas, but that he's "never been a person . . . to attack anybody for no reason. That's for sure. I've never been. But uh all my life I've had a reason to do something like that. But I should've just swung fists with the . . . peckerhead is what I shoulda done." (Defendant's Exh. C, 31:34).

[31] Accordingly, we find that Arndt's police interview supports, rather than contradicts, Dr. Aggarwal's testimony that Arndt had a clear recollection of events. According to Dr. Aggarwal, this is an indication that Arndt likely knew

right from wrong at the time of the murder because people who have psychotic breaks from reality "[u]sually [do] not" have a clear memory of the event. (Tr. p. 695). The primary issue for the jury to decide was whether Arndt knew right from wrong at the time of the murder, and not once during his interview did he indicate that he did not know what he was doing or that he believed his actions were justified. Rather, Arndt unmistakably stated that he had comprehended his actions; that he had been overcome with rage; and that he did not intend for Thomas to die. Furthermore, Arndt described many of the same delusions during his police interview as in his interviews with Dr. Titus and Dr. Aggarwal; thus, even without the admission of the video, the jury was aware of Arndt's delusional thoughts and was able to consider them in rendering its verdict. Dr. Titus and Dr. Aggarwal diagnosed Arndt with paranoid schizophrenia but also clarified that Arndt's diagnosis did not inexorably preclude him from appreciating the wrongfulness of his conduct at the time of the event. Moreover, it is clear that, even in the absence of the video, the jury discredited Dr. Heroldt's opinion that Arndt was not suffering from any mental illness at the time of the event, as demonstrated by the fact that the jury found Arndt to be guilty, but mentally ill at the time of the murder. Therefore, we conclude that the admission of the police interview would not have impacted the jury's verdict; thus, any error in its exclusion was harmless.

## II. *Sentencing*

[32] Arndt also claims that the trial court abused its discretion by imposing a sentence beyond the advisory term of fifty-five years. *See* I.C. 35-50-2-3(a).

Sentencing decisions are reserved to the sound discretion of the trial court, and we will uphold a trial court's sentence unless it is an abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490, *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007).

> Circumstances under which a trial court may be found to have abused its discretion include: (1) failing to enter a sentencing statement, (2) entering a sentencing statement that includes reasons not supported by the record, (3) entering a sentencing statement that omits reasons clearly supported by the record, or (4) entering a sentencing statement that includes reasons that are improper as a matter of law.

*Healey v. State*, 969 N.E.2d 607, 616 (Ind. Ct. App. 2012) (citing *Anglemyer*, 868 N.E.2d at 490-91), *trans. denied*.

[33] Arndt contends that the trial court abused its discretion by failing to consider the factors outlined in *Weeks v. State*, 697 N.E.2d 28, 30 (Ind. 1998), for determining "what mitigating weight to accord the evidence of mental illness." (Appellant's Br. p. 12). In *Weeks*, our supreme court "emphasized that a [guilty but mentally ill] defendant 'is not automatically entitled to any particular credit or deduction from his otherwise aggravated sentence' simply by virtue of being mentally ill." *Weeks*, 697 N.E.2d at 30. However, the *Weeks* court noted that, although the trial court is under "no obligation to give the evidence the same weight the defendant does[,]" the following "considerations . . . bear on the weight, if any, that should be given to mental illness in sentencing": "(1) the extent of the defendant's inability to control his or her behavior due to the

disorder or impairment; (2) overall limitations on functioning; (3) the duration of the mental illness; and (4) the extent of any nexus between the disorder or impairment and the commission of the crime." *Id.* (citing *Archer v. State*, 689 N.E.2d 678, 685 (Ind. 1997)).

[34]   Here, the trial court did consider Arndt's mental illness in its determination of mitigating and aggravating circumstances, acknowledging that Arndt "has a history of undiagnosed mental illness and angry mood swings." (Tr. p. 910). The trial court elaborated, "At best, according to Dr. H[e]roldt, [Arndt] did not possess any mental disease or defect at the time of the offense. At worst, according to Dr. Titus and Dr. Agg[a]rwal, a diagnosis of paranoia schizophrenia was appropriate. Given the testimony of [APS] and a multitude of exhibits, including APS investigations of unstable behavior, the [j]ury found [Arndt] guilty of murder, but mentally ill." (Tr. pp. 910-11). Ultimately, the trial court concluded that the aggravating circumstances outweighed the mitigating circumstances. In accordance with the *Weeks* factors, Arndt now posits that the trial court "did not give weight to Dr. Titus' conclusion that had [Arndt] not been suffering from paranoid schizophrenia the incident probably would not have happened, the testimony from neighbors that he has been suffering from mental health issues since he was young, as well as his living conditions at the time of the offense." (Appellant's Br. p. 13).

[35]   Nine years after *Weeks* was decided, our supreme court made it clear that a trial court cannot "be said to have abused its discretion in failing to 'properly weigh' [aggravating and mitigating] factors." *Anglemyer*, 868 N.E.2d at 491.

Accordingly, Arndt's claim that the trial court improperly weighed his proffered mitigating factor "is not available for appellate review." *Id.* at 494. We therefore affirm Arndt's sixty-year sentence.

## CONCLUSION

[36] Based on the foregoing, we conclude that the trial court's exclusion of Arndt's police interview from evidence did not rise above harmless error. We further conclude that the trial court acted within its discretion by imposing a sixty-year sentence.

[37] Affirmed.

[38] Kirsch, J. and Pyle, J. concur