## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 15 2019, 10:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Bradley Keffer
Brooke Smith
Keffer Hirschauer LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Donovan Andrew Thomas,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

August 15, 2019

Court of Appeals Case No.
18A-CR-2979

Appeal from the Vanderburgh
Circuit Court

The Honorable David D. Kiely,
Judge

Trial Court Cause No.
82C01-1801-MR-58

**Brown, Judge.**

[1] Donovan Andrew Thomas appeals his convictions for murder, conspiracy to commit armed robbery as a level 3 felony, and attempt to commit armed robbery as a level 3 felony. Thomas raises three issues, which we revise and restate as:

    I.    Whether the trial court abused its discretion in denying his request for a continuance;

    II.    Whether the court abused its discretion in admitting the original and edited recordings of the surveillance footage of the Carousel Restaurant as evidence; and

    III.    Whether the court committed fundamental error in instructing the jury.

We affirm.

### Facts and Procedural History

[2] Several days prior to December 30, 2017, DaSean Summers and Thomas smoked marijuana, Summers shared that he was "about to reup," which means "get some more" marijuana, and Thomas said that he wanted to purchase six pounds. Transcript Volume III at 6. At some point, Summers arranged to meet with Levi Lewis, from whom he had previously bought a pound of marijuana for about $2300, and Lewis agreed to sell him eight pounds for a total "[i]n the ballpark of $18,000." Transcript Volume II at 154. Lewis asked Michael Pardee if he would supply the eight pounds and accompany him to ensure everything went smoothly.

[3] On December 30, 2017, Lewis texted Summers that the transaction would occur that day. Lewis and Pardee drove to Evansville in Lewis's 2011

Volkswagen Jetta to make the deal with the eight pounds of marijuana in individual one-pound vacuum-sealed bags which were together in a single black trash bag.

[4] Thomas agreed to assist Summers and be "part of th[e] drug deal" "acting as muscle." Transcript Volume III at 105. Thomas had a gun and he and Tameron Knuckles picked up Romanno Wright and then Summers. *Id.* at 106. Summers had about "52, 5300" dollars on him to purchase two pounds of marijuana, but never saw Thomas or Wright with the money for the six pounds Thomas planned to purchase. *Id.* at 10-11. As the four of them pulled up to the Washington Square Mall, Thomas said, "we should just get on that and rob them," and Wright agreed with him. *Id.* at 15. Summers responded that he was "not with that and it's not going to be none of that." *Id.*

[5] Summers and Lewis communicated and coordinated the meeting, and they parked the vehicles in front of the Washington Square Mall. *Id.* at 11. Before entering Lewis's vehicle, Summers asked for Thomas's money, and Thomas refused and told him that he wanted to "be there when the transaction went down." *Id.* at 12. Because it was a busy environment, they agreed to drive across the street into the parking lot of the Carousel Restaurant, and they parked around the back of it.

[6] When Summers returned to Lewis's vehicle, there was tension. The marijuana was passed around and everybody touched it, and Summers exited to retrieve trash bags for his two pounds of marijuana. When he returned, Lewis asked to

see some money, Summers started counting his money, and Thomas said he left it in the other vehicle, and exited and went over to the vehicle. When Thomas said he left the money in the other vehicle, Summers had a "bad feeling" because "of the conversation that [he] had overheard" between Thomas and Wright. *Id.* at 15.

[7] Thomas returned to the front passenger seat, Lewis, Pardee and Summers exchanged money and the two pounds of marijuana, Summers looked up and saw Thomas "leaning forward," and "[Summers] just got out of the car." *Id.* at 16. Thomas reached over and turned off Lewis's vehicle. Pardee said, "no, no, no, it doesn't need to go down this way," Thomas shot Pardee, and the bullet entered his left cheek, passed through his head, and exited. Transcript Volume II at 155. Pardee died as a result of the gunshot. Thomas left the scene, met up with Summers, and demanded Summers give him the two pounds of marijuana.

[8] On January 3, 2018, the State charged Thomas with Count I, felony murder, alleging that Thomas killed Pardee while "committing or attempting to commit robbery"; Count II, robbery resulting in serious bodily injury as a level 2 felony; Count III, conspiracy to commit armed robbery as a level 3 felony; and Count IV, armed robbery as a level 3 felony, alleging that Thomas knowingly or intentionally took "property from [Lewis] or the presence of" Lewis by force or by threatening the use of force while armed with a deadly weapon. Appellant's Appendix Volume II at 21. The State also filed sentence enhancement allegations claiming that Thomas committed the felony offenses while he was a

member of, and at the direction of or in affiliation with, a criminal organization and that he knowingly and intentionally used a firearm while committing Counts I and II.

[9] A June 11, 2018 entry in the chronological case summary ("CCS") indicates that Thomas's original public defender had a conflict, and a June 13, 2018 CCS entry states that the public defender's office reassigned a special public defender ("Thomas's counsel") to the case. A June 27, 2018 entry states that a jury trial was scheduled for October 22, 2018.

[10] On October 1, 2018, the court held a hearing in which Thomas's counsel asked for the case "to be reset for a short period of time" beyond the October 22nd date and explained that he was assigned to the case following the discovery of a conflict with original counsel and "that's caused some disruption getting discovery . . . I was late in getting an autopsy report." Transcript Volume IV at 4. He also indicated that "[a] couple of weeks ago [he] was notified by [the State] that a statement had been given by" Summers and that he would want to depose him. *Id.* The State indicated that Summers was a co-defendant and that it believed it had provided all of the discovery, "but due to the change over in attorneys, we're going to meet and go over, there is a lot of video, a lot of details." *Id.* The trial court denied the motion for a continuance and explained to Thomas's counsel that he still had three weeks to prepare and that he "had since June when we set it, it's a murder case, we have multiple murder cases in the court, we just can't back them up, I mean we're getting close to a year." *Id.* at 5. After the court stated, "after you meet with the State, if you don't have all

the discovery which should have already been turned over, I'll order them to turn it over to you by this Friday," Thomas's counsel indicated that he was "going to be out of town on business the later part of this week and [he had] a lot of other matters to deal with in the next three weeks, so [he did not] think it's unreasonable under the circumstances to seek a short continuance." *Id.* at 5-6. The court responded that, with its calendar and the number of cases it had, "we're going to try it on that date." *Id.* at 6.

[11] On October 15, 2018, the State filed an amended information that charged Thomas with Count V, attempted armed robbery as a level 3 felony under "I.C. 35-42-5-1(a)(1) & I.C. 35-41-5-1(a)," alleging that Thomas "did knowingly or intentionally attempt to take property from [Lewis] or the presence of [Lewis], by using force or by threatening the use of force while [Thomas] was armed with a deadly weapon, by pointing a firearm at [Lewis] and demanding [Lewis] give [Thomas] marijuana." Appellant's Appendix Volume II at 35. On October 19, 2018, the court held a hearing in which Thomas's counsel indicated that he was able to take Summers's deposition "but now the State tells me that I only received a part of that statement, it was in two different segments, and I've just been given the disc today of a further statement by" Summers, and moved to vacate the trial date. Transcript Volume IV at 10. The prosecutor responded:

> We were not provided that by the police. [Another prosecutor] attended that and he watched the video remotely and we did not discover that we did not have both parts, we thought it was all in one part, it was one interview that was in two sections, we did

not discover that we didn't have it until yesterday. We asked the police to provide the interview, they did, but they only provided the second part, so it's not like we've been sitting on both parts and just decided to give him the first part, so we didn't discover he didn't have it until yesterday afternoon.

*Id.* at 10-11. The State indicated that the additional video was approximately fifty minutes, and the court directed Thomas's counsel to review it, affirmed the trial date, and denied his motion to continue.

[12] With respect to the amended charging information, the State argued that Count V had the same elements as Count IV, except that it was an attempt count which did not "change his defenses" and had the "same victim, . . . same date, same time, same events." *Id.* at 12. After some argument, the State indicated that it would move either to dismiss Count IV as long as Count V "were to stand as the attempt" or to amend Count IV to be an attempted robbery using the language that it proposed for Count V. *Id.* at 15. Thomas's counsel continued his objection, and the court permitted the State to amend count IV "to use the language that would have been an additional repetitive count."[1] *Id.* at 17.

---

[1] The record contains an amended information, filed on October 20, 2018, which states in part: "Count 4: . . . [Thomas] did knowingly or intentionally attempt to take property from [Lewis] or the presence of [Lewis], by using force or by threatening the use of force while [Thomas] was armed with a deadly weapon, by pointing a firearm at [Lewis] and demanding [Lewis] give [Thomas] marijuana." Appellant's Appendix Volume II at 74.

[13]     At trial, Evansville Police Department Detective John Pieszchalski testified that he had training in "how to take video evidence from, that's maybe viewed from proprietary software capturing into a video" and that he had been to two separate classes, the first one involved the collection of "cameras and digital media, multi-media evidence, also DVR systems, that was a three day, 24 hour course [which] did nothing but entail pulling that video off, being able to view it." Transcript Volume II at 100-101. He testified that he first viewed the Carousel video on the machine "[i]nside the manager's office in the back." *Id.* at 105. The prosecutor showed him State's Exhibit 89 and asked if he recognized it, and Detective Pieszchalski stated that it was "the video that [he] collected originally on scene and the second day when [he] had to come back and get the further one hour." *Id.* at 102. When asked what device he used to collect the Carousel data he stated that "[t]hat all depends, it depends on what they have." *Id.* at 103. Referencing the DVD discs in Detective Pieszchalski's hand, the prosecutor asked if he transferred the media from a thumb drive to a computer, and Detective Pieszchalski explained:

> I go get the Video, I export it on to my thumb drive from the DVR system or the PC system, I come back to the office, I download it off of my thumb drive on to my work station which I'll use Quickhash, what happens is we make a hash of it . . . all it is [] mathematical algorithm that gives that video that file a persay [sic] fingerprint that we can come back and match to, it's used across many different programs, but it's the same, so I'll hash it over when I do it on my work state which will become my work copy and then I'll also burn them onto an original, these will be considered original DVDR'S and it will be hashed that way too to make sure that there's no change into it and then

these will be stored into evidence and then I'll have my work copy so if anything needs to come up off of it, I can work off of those and not the originals.

*Id.* at 103-104. Detective Pieszchalski answered affirmatively when asked if he "compare[d] the thumb drive or flash drive hash values to what was burned on those discs," if the "hash values on the thumb drive are the same as the ones on the DVD disc," and "[s]o it's the same video." *Id.* at 104. When the State moved to admit State's Exhibit 89, the following exchange occurred:

[Thomas's counsel]: Preliminary questions, please. The final product originally was captured from the Carousel's recording on a thumb drive?

[Detective Pieszchalski]: Yes.

[Thomas's counsel]: Then for security purposes you transferred the thumb drive to this permanent disc?

[Detective Pieszchalski]: Yes.

[Thomas's counsel]: Did you personally do that?

[Detective Pieszchalski]: Yes.

[Thomas's counsel]: Did you find any flaws or errors or problems in the Carousel system, any problems with the Carousel recording system that you could determine?

[Detective Pieszchalski]: No problem that I viewed.

[Thomas's counsel]: Okay. Did the thumb drive, based upon your examination extraction, accurately record the Carousel Video portions that you extracted?

[Detective Pieszchalski]: Yes.

[Thomas's counsel]: And was there an accurate extraction based upon your examination from the thumb drive to the permanent system before you cleaned the thumb drive?

[Detective Pieszchalski]: Yes, using Quickhash and the hash values.

*Id.* at 104-105. When asked if he obtained the original video from "Carousel ownership or search warrant," Detective Pieszchalski indicated that other detectives had already been there and spoken to the owner or manager there prior to him arriving on the scene. *Id.* at 105. He answered in the negative when asked "[b]ut you're not aware of how that permission was granted to the EPD," and Thomas's counsel stated that he was "not accusing the EPD of pirating this . . . , but I think we need a consent or the manager here" and the court admitted State's Exhibit 89 over objection.[2] *Id.* at 105-106.

[14] At the conclusion of the State's presentation of the evidence, which consisted in part of the testimony of twelve witnesses including Lewis and Summers, Thomas's counsel moved for judgment on the evidence, and the court granted the motion as to Count II and denied it as to the other counts. Thomas testified that Lewis pulled a gun and pointed it towards the "back-rear door, door area

---

[2] Before Thomas testified on the third day of trial, the court discussed and clarified with the State that its Exhibit 89a was "the original Carousel videos that [Detective Pieszchalski] put on a flash drive and then copied on the three discs," and Exhibit 89b was "the compilation of the incident that the jury has seen." Transcript Volume III at 78-79.

where Wright was, had approached," that he did not shoot Pardee, and that he left the car and ran once Lewis pulled the gun. Transcript Volume III at 95.

[15] In its final instructions to the jury, the court included Instruction No. 2, which states:

> In Count 1, the statute defining the offense of Murder, a felony, which was in force at the time of the offense charged, reads in part as follows: A person who kills another human being while committing or attempting to commit Robbery commits Murder, a felony.
>
> Before you may convict the Defendant in Count 1, the State must have proved each of the following elements beyond a reasonable doubt:
>
> 1. The Defendant, Donovan Andrew Thomas,
>
> 2. killed
>
> 3. Michael Pardee
>
> 4. while committing or attempting to commit Robbery, which is defined as:
>
>> a. knowingly or intentionally
>>
>> b. taking property from another person or taking property from the presence of another person
>>
>> c. by using or threatening the use of force.
>
> If the State failed to prove each of these elements beyond a reasonable doubt, you must find the Defendant not guilty of Murder, a felony, as charged in Count 1.

Appellant's Appendix Volume II at 107. Instruction No. 5 states:

Aiding, inducing, or causing an offense is defined by law as follows: A person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense.

A person may be convicted of aiding, inducing, or causing an offense even if the other person has not been prosecuted for the offense, has not been convicted of the offense, or has been acquitted of the offense.

*Id.* at 112. Instruction A provides: "The rule of law which requires proof of guilt beyond a reasonable doubt applies to each juror individually. Each of you must refuse to vote for conviction unless you are convinced beyond a reasonable doubt of the Defendant's guilt. Your verdict must be unanimous." *Id.* at 127. Instruction B states in part:

If the evidence in this case is susceptible of two constructions or interpretations, each of which appears to be reasonable, and one of which points to the guilt of the Defendant, and the other to the Defendant's innocence, it is your duty, under the law, to adopt that interpretation which will admit of the Defendant's innocence, and reject that which points to the Defendant's guilt.

*Id.* Instruction E provided that "[t]o return a verdict, all of you must agree to it. In other words, it must be unanimous." *Id.* at 130.

[16] After the jury returned guilty verdicts for each of the remaining counts, Thomas pled guilty to the firearm enhancement, and the court granted the State's motion to dismiss the gang enhancement. The court sentenced Thomas to fifty-five years increased by an additional ten years for the firearm enhancement for a total of sixty-five years on the murder conviction, to nine years on the

conspiracy to commit armed robbery conviction, and to six years on the attempt to commit armed robbery conviction, and ordered the sentences to be served concurrently.

## *Discussion*

### I.

[17] The first issue is whether the trial court abused its discretion in denying Thomas's request for a continuance. Thomas maintains the court had dates available that would have allowed him the opportunity to fully investigate evidence that was withheld by the State until the eve of trial or, in the alternative, the court could have excluded certain evidence from trial. He argues that the State "failed to turn over material evidence" when it disclosed Summers' "vitally important" statement against him ten months into the case and then, the last business day before trial, provided him with fifty minutes of the recorded statement that had not been previously disclosed. Appellant's Brief at 24. He contends that he "suggested a trial date within one year that may have been available on the court's calendar" which would have been suitable, and argues that while he did depose Summers after the October 1, 2018 hearing, he had virtually no opportunity before trial to conduct a second deposition of Summers after the remaining fifty minutes of statement was provided. *Id.* at 23. In his reply brief, he asserts that the court denied his requests "based solely on calendaring conditions and slippery slope-style concerns about other pending cases." Appellant's Reply Brief at 5.

[18] Rulings on non-statutory motions for continuance are within the trial court's discretion and will be reversed only for an abuse of that discretion and resultant prejudice. *Robinson v. State*, 91 N.E.3d 574, 577 (Ind. 2018) (citing *Maxey v. State*, 730 N.E.2d 158, 160 (Ind. 2000)). An abuse occurs only where the trial court's decision is clearly against the logic and effect of the facts and circumstances. *Id.* (citing *Palmer v. State*, 704 N.E.2d 124, 127 (Ind. 1999)). "There is a strong presumption that the trial court properly exercised its discretion." *Id.* (quoting *Warner v. State*, 773 N.E.2d 239, 247 (Ind. 2002)). "We will not conclude that the trial court abused its discretion unless the defendant can demonstrate prejudice as a result of the trial court's denial of the motion for continuance." *Stafford v. State*, 890 N.E.2d 744, 750 (Ind. Ct. App. 2008). Continuances to allow more time for preparation are not favored and are granted only by showing good cause and in the furtherance of justice. *Id.* (citing *Timm v. State*, 644 N.E.2d 1235, 1237 (Ind. 1994)). Further, motions to allow more time for preparation "require a specific showing as to how the additional time would have aided counsel." *Zanussi v. State*, 2 N.E.3d 731, 734 (Ind. Ct. App. 2013).

[19] The record reveals that the public defender's office reassigned Thomas a special public defender in June 2018, two weeks before the court scheduled the jury trial for October 22, 2018. Thomas's counsel first asked for a continuance on October 1, 2018, explaining there was some disruption in obtaining an autopsy report, that a couple of weeks prior the State had notified him that Summers had given a statement, and that he wished to depose Summers. In denying the motion, the

court indicated to Thomas's counsel that if, after meeting with the State, he did not have everything which should have already been turned over, it would order the State to do so. At the October 19, 2018 hearing, Thomas's counsel indicated that he had deposed Summers and moved to vacate the trial date because he had just then received the second of two segments of the statement, which was approximately fifty minutes in length. The State responded that the police had not provided it with the second segment; that the prosecutor who attended the interview watched the video remotely; that it had thought the interview was all in one part and did not discover that it did not have both parts until the day prior to the hearing; and, that it did not discover Thomas did not have the second segment until the afternoon of the day prior to the hearing. Thomas's counsel received the fifty-minute recording three days prior to trial, and he did not renew his motion for a continuance on the morning of trial. Thomas does not provide a specific showing of how additional time would either have aided counsel or be in the furtherance of justice. Under these circumstances, we find that the trial court did not abuse its discretion.

## II.

[20] The next issue is whether the trial court abused its discretion in admitting the original and edited recordings of the surveillance footage of the Carousel Restaurant as evidence. Generally, we review the court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied*. Admission of photographs and videotapes lies within the sound discretion of the court, and its ruling will not be

disturbed absent an abuse of that discretion. *Shepherd v. State*, 690 N.E.2d 318, 324 (Ind. Ct. App. 1997) (citing *Isaacs v. State*, 659 N.E.2d 1036, 1043 (Ind. 1995), *reh'g denied*, *cert. denied* 519 U.S. 879, 117 S. Ct. 205 (1996)), *trans. denied*, *disagreed with on other grounds*. We will reverse only if the trial court's ruling was clearly against the logic and effect of the facts and circumstances before it. *McCallister v. State*, 91 N.E.3d 554, 561 (Ind. 2018) (citing *Knapp v. State*, 9 N.E.3d 1274, 1281 (Ind. 2014), *cert. denied*, —— U.S. ——, 135 S. Ct. 978 (2015)).

[21]  Thomas argues that the State, by and through Detective Pieszchalski, did not establish a sufficient foundation for the admission of the original or edited digital video evidence of Exhibits 89a and its derivative 89b. He contends in essence that the State did not present any witness or evidence as to how and when the video camera was loaded or activated, when the photographs were taken, and the processing and chain of custody of the film after its removal from the camera, and thus that the State failed to make a showing of the authenticity and competency of the digital video evidence collected from the Carousel Restaurant.

[22]  Ind. Evidence Rule 901(a) provides: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Absolute proof of authenticity is not required. *M.T.V. v. State*, 66 N.E.3d 960, 963 (Ind. Ct. App. 2016), *trans. denied*. Rather, the proponent of the evidence must establish only a reasonable probability that the evidence is what it is claimed to be. *Pavlovich v. State*, 6 N.E.3d 969, 976 (Ind. Ct. App.

2014), *trans. denied*. Authenticity may be established, among other methods, by "[t]estimony of a witness with knowledge that a matter is what it is claimed to be." Ind. Evidence Rule 901(b)(1). The record reveals that Detective Pieszchalski testified about his training in extracting video surveillance footage and collecting multimedia evidence. When asked about Exhibit 89, he indicated that it was the video footage he "collected originally on scene." Transcript Volume II at 102. He testified that he first viewed the footage on the machine inside the Carousel manager's back office, and in response to being asked about the discs in Exhibit 89 and whether he transferred the media from a thumb drive to a computer, he testified about retrieving the video footage, exporting it on his thumb drive from the source, and returning and downloading it at the office to use programs such as Quickhash to provide a digital "fingerprint" which allows its use across many different programs. *Id.* at 103-104. He testified that he compared the thumb drive or flash drive hash values to what was burned on the discs and indicated that they were the same video. In response to preliminary questions posed by Thomas's counsel prior to the admission of Exhibit 89, Detective Pieszchalski indicated that the final product originally was captured from the Carousel's recording on a thumb drive, that he did not experience "any flaws or errors or problems . . . with the Carousel recording system," that there was an accurate extraction to the thumb drive and that the thumb drive accurately recorded the Carousel video portions that he extracted, and that he personally "transferred the thumb drive to this permanent disc" for security purposes. *Id.* at 104-105. Based upon the record,

we cannot say that the trial court abused its discretion in admitting the recordings.

## III.

[23] The next issue is whether the trial court committed fundamental error in instructing the jury. Thomas argues the State's "scattershot" presentation to the jury and the court's final jury instructions created a significant possibility that the jury failed to reach a unanimous determination on the essential elements of felony murder. Appellant's Brief at 28. He contends the State's facts and arguments at trial allowed for a variety of different crimes to have occurred of which the jury could have selected any combination and produced a conviction. Specifically, he asserts that, except for Pardee as the decedent, every essential element of the State's felony murder charge had an alternative claim, that the jury was left to contend with the factors of whether "Pardee was shot by Thomas or Lewis, whether the underlying felony was robbery or attempted robbery, whether that felony was perpetrated by Thomas or Summers, and whether that felony was perpetrated upon Pardee or Lewis"; and that "such considerations are not merely alternate theories, but different and significant criminal charges that the State failed to narrow." *Id.* at 33-34. The State maintains Thomas cannot prove fundamental error because the only issue was the credibility of witnesses and the case amounted to whether the jury believed Summers and Lewis or whether they believed Thomas.

[24] As he admits in his brief and as the record reveals, Thomas's counsel did not object to the final jury instructions at trial. Because Thomas did not object to Instruction No. 1 or offer an alternative instruction, he has waived his challenge to the instruction. *See Baker v. State*, 948 N.E.2d 1169, 1178 (Ind. 2011) (holding that the defendant had not objected to the trial court's instruction or offered an instruction of his own and accordingly had waived the issue) (citing *Mitchell v. State*, 726 N.E.2d 1228, 1241 (Ind. 2000) (noting "a defendant who fails to object to an instruction at trial waives any challenge to that instruction on appeal") (citing Trial Rule 51(C)), *reh'g denied*, *abrogated on other grounds by Beattie v. State*, 924 N.E.2d 643 (Ind. 2010); *Ortiz v. State*, 766 N.E.2d 370, 375 (Ind. 2002) ("Failure to tender an instruction results in waiver of the issue for review.")). We will review an issue that was waived at trial if we find fundamental error occurred. *Id.* (citing *Bruno v. State*, 774 N.E.2d 880, 883 (Ind. 2002), *reh'g denied*). In order to be fundamental, the error must represent a blatant violation of basic principles rendering the trial unfair to the defendant and thereby depriving the defendant of fundamental due process. *Id.* The error must be so prejudicial to the defendant's rights as to make a fair trial impossible. *Id.* In considering whether a claimed error denied the defendant a fair trial, we determine whether the resulting harm or potential for harm is substantial. *Id.* at 1178-1179. Harm is not shown by the fact that the defendant was ultimately convicted. *Id.* at 1179. Rather, harm is determined by whether the defendant's right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he would have been entitled. *Id.*

[25] Thomas has not demonstrated that fundamental error occurred. A jury must unanimously agree regarding which crime a defendant committed, and each count of an information may include only a single offense. *State v. Sturman*, 56 N.E.3d 1187, 1203 (Ind. Ct. App. 2016) (citations omitted). Thus, an instruction which allows the jury to find a defendant guilty if he commits either of two or more underlying acts, either of which is in itself a separate offense, is ambiguous because it is impossible to determine whether the jury unanimously found that the defendant committed one particular offense. *Id.* Nevertheless, the State is permitted to "allege alternative means or 'theories of culpability' when prosecuting the defendant for a single offense." *Id.* (citing *Baker*, 948 N.E.2d at 1175 (citation omitted)). In other words, the State is permitted to "present the jury with alternative ways to find the defendant guilty as to one element." *Id.* (brackets omitted) (citing *Baker*, 948 N.E.2d at 1175 (quoting *Cliver v. State*, 666 N.E.2d 59, 67 (Ind. 1996) ("In criminal cases, as in all litigation, different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line.") (citation and internal quotation marks omitted), *reh'g denied*)). "[W]hile jury unanimity is required as to the defendant's guilt, it is not required as to the theory of the defendant's culpability." *Taylor v. State*, 840 N.E.2d 324, 333 (Ind. 2006).

[26] In *Taylor*, the State pursued two theories on how the defendant could be guilty of murder, either by killing the victim or by aiding and abetting another person to kill the victim. *Id.* at 331. The defendant argued on appeal that the jury should have been instructed that, in order to convict him of murder, the verdict

had to be unanimous on one of the two prosecution theories. *Id.* at 332. The Court observed that the jury had to determine only whether the defendant committed one act of murder, stated that there were two different theories upon which the jury could have found that the defendant committed this one act, either as the principal or an accomplice, and noted that the defendant would have been equally guilty of murder whether he acted as the principal shooter or merely an accomplice. *Id.* at 333. In *Sturman*, the State charged the defendant with multiple counts of reckless homicide and issuing an invalid prescription, and the defendant argued that the method of charging him allowed for non-unanimous jury verdicts. 56 N.E.3d at 1202-1203. We observed that, within each charge for reckless homicide, the State alleged "alternative means" by which the reckless homicide was committed, namely, by issuing prescriptions "for Methadone, Dilaudid, and/or Valium without medical legitimate purpose and outside the usual course of practice." *Id.* at 1204. We held in part that, so long as each juror was convinced beyond a reasonable doubt that the defendant was guilty of reckless homicide, the jury need not have decided unanimously by which theory he was guilty. *Id.* (citing *Taylor*, 840 N.E.2d at 333-334).

[27] With regard to Count I, Instruction No. 2 stated that, before the jury could convict Thomas, the State must have proved each of the four elements beyond a reasonable doubt. Instruction No. 5 provided that a person may be convicted of aiding, inducing, or causing an offense even if the other person has not been prosecuted for the offense, has not been convicted of the offense, or has been acquitted of the offense. In Instructions A and E, the court instructed the jury

that the "verdict must be unanimous" and that to "[t]o return a verdict, all of you must agree to it" or "[i]n other words, it must be unanimous." Appellant's Appendix Volume II at 127, 130. The jury could find Thomas committed the murder as a principal or accomplice. The jury found he committed an attempted armed robbery, and it need not have decided unanimously by which theory or alternative means he was guilty. In light of the final instructions, we conclude that the trial court did not commit fundamental error in instructing the jury.

[28] For the foregoing reasons, we affirm Thomas's convictions.

[29] Affirmed.

May, J., and Mathias, J., concur.